1   MICHAEL C. MARKHAM – Florida Bar No. 0768560
    MikeM@jpfirm.com
2   ANGELINA LIM – Florida Bar No. 158313
    angelinal@jpfirm.com
3   JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP
    403 East Madison Street, Suite 400
4   Tampa, Florida 33602
    Telephone: (813) 225-2500
5   Facsimile: (813) 223-7118

6   GREGORY J. HUGHES – CA Bar No. 071288
    HUGHES LAW CORPORATION
7   3017 Douglas Blvd., Suite 300
    Roseville, CA 95661
8   Telephone:  (916) 774-7506

9   General Counsel for
    Chapter 11 Trustee, Gerard A. McHale, Jr.

10

11              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF CALIFORNIA
12                   SACRAMENTO DIVISION

13  In re:                          |    Case No. 12-35905 – C – 11

14  SKY KING, INC.,                 |    Chapter 11 Proceeding

15          Debtor.                 |

16

17         ORDER CONFIRMING CHAPTER 11 TRUSTEE'S PLAN OF
           REORGANIZATION AND APPROVING MODIFICATIONS THERETO

18          The Court having reviewed the Chapter 11 Trustee's, Gerard A. McHale, Jr., ("Trustee")

19  Plan of Reorganization (Doc. No. 887) ("Plan"); the Disclosure Statement (Doc. No. 882)

20  ("Disclosure Statement"), the Declaration of the Trustee is Support of Plan Confirmation (Doc.

21  No. 950), the Declarations of Ballot Tabulation (Doc No. 953, 966), the Declaration Regarding

22  Plan Modifications (Doc. No. 955), the Memorandum in Support of Confirmation (Doc. No.

23  892) and the Motion for Approval of Compromise under Bankruptcy Rule 9019 with Lessors

RECEIVED
September 25, 2014
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0005332282

1    Aergo and ACG (Doc. No. 937) and the Court's having heard from the parties at the hearing

2    conducted on confirmation of the Plan on September 24, 2014 ("Hearing"), and all objections or

3    responses to confirmation of the Plan having been withdrawn at the Hearing, and upon the record

4    at the Hearing the Court made findings of fact and conclusions of law pursuant to Fed.R.Bankr.P

5    52; accordingly, it is hereby –

6         **ORDERED** that the Disclosure Statement is APPROVED, and it is further

7         **ORDERED** that the Plan, as modified, a true and correct copy of which is attached

8    hereto as Exhibit "1," is hereby CONFIRMED, and it is further

9         **ORDERED** that this Court shall retain jurisdiction with respect to all matters arising

10   from or related to the Plan and the interpretation or enforcement of this Order.

11   Dated: October 03, 2014

12

13

                    United States Bankruptcy Judge

14

15

16

17

18

19

20

21

22

23

24   2038785_1

1  MICHAEL C. MARKHAM – Florida Bar No. 0768560
   MikeM@jpfirm.com
2  ANGELINA LIM – Florida Bar No. 158313
   angelinal@jpfirm.com
3  JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP
   403 East Madison Street, Suite 400
4  Tampa, Florida 33602
   Telephone: (813) 225-2500
5  Facsimile: (813) 223-7118

6  GREGORY J. HUGHES – CA Bar No. 071288
   HUGHES LAW CORPORATION
7  3017 Douglas Blvd., Suite 300
   Roseville, CA 95661
8  Telephone:  (916) 774-7506

9  General Counsel for
   Chapter 11 Trustee, Gerard A. McHale, Jr.

10

          **UNITED STATES BANKRUPTCY COURT**
11          **EASTERN DISTRICT OF CALIFORNIA**
                **SACRAMENTO DIVISION**
12

13  In re:                        |     Case No. 12-35905 – C – 11
                                   |
    SKY KING, INC.,                |     Chapter 11 Proceeding
14                                 |
            Debtor.                |
15  _____|

16       **CHAPTER 11 TRUSTEE'S PLAN OF REORGANIZATION**

17      **TO THE HONORABLE CHRISTOPHER M. KLEIN, U.S. CHIEF
    BANKRUPTCY JUDGE:**

18

19

20

21

22

                        ┌─────────────────┐
                        │    **EXHIBIT**    │
                        │                 │
                        │      /          │
                        └─────────────────┘

## TABLE OF CONTENTS

I.     DEFINITIONS AND INTERPRETATION .............................................................. 5

    1.1    Definitions. ............................................................................................. 5

    1.2    Interpretation ........................................................................................ 14

    1.3    Application of Definitions and Rules of Construction Contained in the Bankruptcy Code. ................................................................................. 14

    1.4    Other Terms. ......................................................................................... 15

II.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ......................... 15

    2.1    Claims and Equity Interests Classified ............................................... 15

    2.2    Claims and Equity Interests ................................................................. 15

III.   IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS ....................................................................................................... 16

    3.1    Impaired Classes of Claims and Equity Interests ............................... 16

    3.2    Impairment Controversies ................................................................... 16

IV.   PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN ............................................................................................ 16

    4.1    Treatment of Claims and Equity Interests .......................................... 16

V.    PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN .......................................................................................................... 21

    5.1    All claims are classified in Article IV above. ..................................... 21

VI.   ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS ......... 21

    6.1    Classes Entitled to Vote ...................................................................... 21

    6.2    Class Acceptance Requirement ........................................................... 22

VII.  MEANS FOR IMPLEMENTATION OF THE PLAN ......................................... 22

    7.1    Reorganization of the Debtor .............................................................. 22

    7.2    Funding of the Plan ............................................................................. 25

    7.3    Causes of Action ................................................................................. 25

    7.4    Distributions under the Plan ................................................................ 25

    7.5    Timing of Distributions under the Plan ............................................... 26

    7.6    Address for Delivery of Distributions under the Plan ......................... 26

    7.7    Distributions under Fifteen Dollars .................................................... 26

    7.8    Time Bar to Cash Payments ................................................................ 27

    7.9    Manner of Payment under the Plan ..................................................... 27

| | | |
|---|---|---|
| 7.10 | Expenses Incurred on or after the Confirmation Date and Claims of the Trustee | 27 |
| 7.11 | Fractional Distributions | 28 |
| 7.12 | Effectuating Documents and Further Transactions | 28 |
| VIII. | EFFECT OF CONFIRMATION | 28 |
| 8.1 | Discharge of the Debtor | 28 |
| 8.2 | Automatic Stay | 29 |
| 8.3 | Exculpation | 28 |
| 8.4 | Injunction | 29 |
| IX. | THE PLAN ADMINISTRATOR | 32 |
| 9.1 | Powers and Duties | 32 |
| 9.2 | Distributions | 33 |
| 9.3 | Compensation and Expenses Incurred by Plan Administrator | 30 |
| 9.4 | Exculpation | 33 |
| X. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 34 |
| 10.1 | Rejection of Executory Contracts and Unexpired Leases | 34 |
| 10.2 | Claims Arising from Rejection or Termination | 35 |
| XI. | PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS | 35 |
| 11.1 | Objection Deadline | 35 |
| 11.2 | Prosecution of Contested Claims | 36 |
| 11.3 | Claims Settlement Guidelines | 36 |
| 11.4 | No Distributions Pending Allowance | 37 |
| 11.5 | Distributions After Allowance | 37 |
| 11.6 | Estimation of Claims | 37 |
| XII. | CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE | 38 |
| 12.1 | Conditions Precedent to Confirmation | 38 |
| 12.2 | Conditions Precedent to the Occurrence of the Effective Date | 38 |
| 12.3 | Waiver of Conditions | 39 |
| XIII. | RETENTION OF JURISDICTION | 39 |
| XIV. | MISCELLANEOUS PROVISIONS | 42 |
| 14.1 | Payment of Statutory Fees | 42 |
| 14.2 | Dissolution of the Committee | 42 |

14.3    Notices ........................................................................................................ 42

14.4    Headings ..................................................................................................... 43

14.5    Governing Law ........................................................................................... 43

14.6    Notice of Entry of Confirmation Order and Relevant Dates ..................... 43

14.7    No Interest or Attorneys' Fees ................................................................... 43

14.8    Modification of the Plan ............................................................................ 44

14.9    Revocation of Plan ..................................................................................... 44

14.10   Setoff Rights .............................................................................................. 44

14.11   Compliance with Tax Requirements .......................................................... 45

14.12   Recognition of Guaranty Rights ................................................................ 46

14.13   Binding Effect ............................................................................................ 46

14.14   Severability ................................................................................................ 46

1    **INTRODUCTION**

2    Gerard A. McHale, Jr., as Chapter 11 Trustee for the Debtor (the "Trustee"), hereby

3    proposes this plan of reorganization in accordance with Chapter 11 of the U.S. Bankruptcy Code.

4    **I.    DEFINITIONS AND INTERPRETATION**

5    **1.1    Definitions.**

6    The capitalized terms used herein and in the Disclosure Statement shall have the

7    respective meanings set forth below:

8    "Account" means the funds or Cash in any banking institution belonging to the

9    Debtor or its affiliates.

10    "Administrative Claim" means a Claim properly incurred by the Debtor or the

11    Trustee on behalf of the Estate on or after the Petition Date and before the Effective Date

12    for a cost or expense of administration in the Chapter 11 Case entitled to priority under

13    sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, Fee

14    Claims.

15    "AerLine" means AerLine Holdings LLC, as assignee of the Successful Bidder.

16    "Affiliate" means, with respect to any Person, all Persons that would fall within

17    the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such

18    Person was a debtor in a case under the Bankruptcy Code.

19    "Allowed," when used with respect to any Claim, except for a Claim that is an

20    Administrative Claim, means such Claim (A) to the extent it is listed in the Schedules as

21    undisputed, liquidated and not contingent and is not a Contested Claim as of the Effective

22    Date; (B) to the extent it is set forth pursuant to any stipulation or agreement that has

23    been approved by Final Order of the Bankruptcy Court; (C) to the extent it is a Contested

Claim as of the Effective Date, proof of which was filed timely with the Bankruptcy Court, and (I) as to which no objection was filed by the Objection Deadline, <u>unless</u> the Bankruptcy Court determines that such Claim is to be determined in a forum other than the Bankruptcy Court, in which case such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court, or (II) as to which an objection was filed by the Objection Deadline, to the extent allowed by a Final Order; or (D) which otherwise becomes an Allowed Claim as provided in the Plan; and with respect to an Administrative Claim, means an Administrative Claim that has become "Allowed" pursuant to the procedures set forth in Article XI of the Plan.

"<u>Assets</u>" means all of the Debtor's right, title and interest of any nature in property, wherever located, as specified in section 541 of the Bankruptcy Code, BUT excluding the Post-Confirmation Assets.

"<u>Avoidance Actions</u>" means all claims, rights, and Causes of Action in favor of the Estate that arise under the Bankruptcy Code, including, but not limited to, all preference, fraudulent transfer, and other avoidance claims, rights, and Causes of Action arising under chapter 5 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as amended and codified at title 11 of the United States Code and as applicable to the Chapter 11 Case.

"<u>Bankruptcy Court</u>" means the Bankruptcy Court for the Eastern District of California, Sacramento Division or such other court having jurisdiction over this Chapter 11 Case.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Case.

"Bar Date" means the deadline for filing proofs of claim as established by the Bankruptcy Court, i.e. January 2, 2013.

"Business Day" means any day on which commercial banks are open for business in New York, New York.

"Case" means the case under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to the Debtor.

"Cash" means legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's Rating of "A" or better, or equivalent rating of any other nationally recognized rating service, or interest-bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or equivalent capital of not less than Two Hundred Million Dollars ($200,000,000), having maturities of not more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

"Causes of Action" means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown and whether asserted or unasserted.

"Claim" means (i) any right to payment from the Debtor, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from a Debtor, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; or (iii) any right under section 502(h) of the Bankruptcy Code, and shall include, without limitation, (iv) any and all Administrative Claims, Contested Claims, Priority Claims, Secured Claims, Insider Claims, Tax Claims, and Unsecured Claims, whether or not Allowed, treated under this Plan.

"Committee" means the Official Committee of Unsecured Creditors appointed in the Case by the U.S. Trustee.

"Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, on confirmation of the Plan.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

"Contested Claim" means a Claim (A) to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part; (B) that is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent the proof of claim amount

exceeds the scheduled amount; (C) that is not listed in the Schedules, but as to which a proof of claim has been filed with the Bankruptcy Court; or (D) as to which an objection has been filed on or before the Effective Date; provided, that a Claim that is Allowed by Final Order or pursuant to the Plan on or before the Effective Date shall not be a Contested Claim.

"Debtor" means Sky King, Inc.

"Disallowed" when used with respect to a Claim, means a Claim, or such portion of a Claim, that has been disallowed by a Final Order of the Bankruptcy Court.

"Disclosure Statement" means the disclosure statement respecting the Plan, as approved by the Bankruptcy Court as containing adequate information in accordance with section 1125 of the Bankruptcy Code, all exhibits and annexes thereto and any amendments or modifications thereof.

"Distribution" means the payments or distributions under the Plan of property or interests in property to the holders of Allowed Claims. Unless otherwise agreed by the holder of an Allowed Claim any payment in Cash to be made by the Trustee shall be made, at the election of the Trustee, by check drawn on a domestic bank or by wire transfer from a domestic bank.

"Distribution Date" means, with respect to any Claim, the Effective Date, if such Claim is then an Allowed Claim, and such later dates as determined by the Trustee.

"Effective Date" means the "Effective Date" on which all of the conditions specified in Section 12.2 of the Plan have been satisfied or waived.

"Equity Interest" means any existing ownership or equity interest in the Debtor.

1    "Estate" means the estate of the Debtor created by section 541 of the Bankruptcy

2    Code upon the commencement of the Case.

3    "Estimated Claims Order" means any order of the Bankruptcy Court estimating

4    any Claim or the aggregate amount of all Claims in any class created under the Plan to

5    aid in the confirmation of the Plan, or the calculation of distributions under the Plan.

6    "Existing Sky King Stock" means all issued and outstanding shares of common

7    stock of the Debtor.

8    "Fee Application" means an application of a Professional Person under section

9    330 or 503 of the Bankruptcy Code for final allowance of compensation and

10   reimbursement of expenses incurred in the Case from the Petition Date to the Effective

11   Date.

12   "Fee Claim" means a Claim that is the subject of a Fee Application filed in the

13   Case.

14   "Final Order" means (i) an order or judgment of the Bankruptcy Court or any

15   other court or adjudicative body as to which the time to appeal, petition for certiorari, or

16   move for reargument or rehearing has expired and as to which no appeal, petition for

17   certiorari, or other proceedings for reargument or rehearing shall then be pending, or (ii)

18   in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been

19   sought, such order of the Bankruptcy Court or any other court or adjudicative body shall

20   have been affirmed by the highest court to which such order was appealed, or certiorari

21   has been denied, or from which reargument or rehearing was sought, and the time to take

22   any further appeal, petition for certiorari or move for reargument or rehearing shall have

23   expired; provided, that no order shall fail to be a Final Order solely because of the

possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

"Insider" shall have the meaning assigned to it under Section 101 of the Bankruptcy Code and shall include the following Persons:  Scott Holland, Jeff Conry, George McConnaughey, Gregg Lukenbill, Robert Yari, Steve Yari, Dennis Brown, Beata Berez, Dan Carson, Frank Visconti, Allen McAnally and any of their estates, successors, assigns, relatives, Insiders or Affiliates.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

"IRS" means the United States Internal Revenue Service.

"Lien" means any charge or interest in property to secure payment or performance of a claim, debt or obligation.

"Litigation Proceeds" mean any sums recovered by the Trustee or Plan Administrator for any Causes of Action prosecuted for the benefit of the estate and its creditors.

"Objection Deadline" means the deadline for filing objections to Claims as set forth in Section 11.1 of the Plan.

"Order" means an order, judgment or decree made by the Bankruptcy Court.

"Person" means an individual, corporation, partnership, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

"Petition Date" means August 31, 2012.

"Plan" means this plan of reorganization, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules to the foregoing, as the same may be in effect at the time such reference becomes operative.

"Plan Administrator" means the Trustee who will be appointed as the person in charge of the Post Confirmation Plan Administration after the Effective Date.

"Post-Confirmation Administrative Claim" means the costs and expenses incurred by the Trustee and his professionals after the Confirmation Date.

"Post-Confirmation Plan Administration" means the Post Confirmation Assets to be administered by the Trustee and in respect of receiving the Purchase Price and the Post-Confirmation Assets, making distributions, and taking other post-confirmation actions.

"Post-Confirmation Assets" means all Accounts, Cash, Receivables, Litigation Proceeds, Causes of Action and Avoidance Actions held by the Debtor as of the Effective Date, and any equity or other interest in any Person, including SGB Miami Charter Services, LLC, Sky King Air Charters Inc., and Sky King Airlines, Inc.

"Post-Trustee Administrative Claim" means an Administrative Claim incurred by the Trustee after the appointment of the Trustee and before the Effective Date, including Fee Claims authorized by the Trustee.

"Pre-Trustee Administrative Claim" means an Administrative Claim incurred prior to the appointment of the Trustee.

"Priority Claim" means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code including Tax Claims.

1    "Pro Rata Share" means the proportion that the amount an Allowed Claim bears

2    to the aggregate amount of all Claims in a particular class, including Contested Claims,

3    but not including Disallowed Claims, (i) as calculated by the Trustee on or before any

4    Distribution Date; or (ii) as determined by the Bankruptcy Court in an Estimated Claims

5    Order, if such an order is sought and obtained.

6    "Professional Person" means a Person retained or to be compensated for services

7    rendered or costs incurred on or after the Petition Date and on or prior to the Effective

8    Date pursuant to section 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code in this

9    Case.

10    "Purchase Price" has the meaning provided in the Stock Purchase Agreement.

11    "Receivables" means any sums owed by any Persons to the Debtor for its services

12    rendered or goods sold, the collection of monies, escrow, Claims, Accounts or the like.

13    "Schedules" means the schedules of assets and liabilities and the statements of

14    financial affairs filed by the Debtor with the Bankruptcy Court, as required by section

15    521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules,

16    as such schedules and statements may be amended by the Trustee from time to time in

17    accordance with Bankruptcy Rule 1009.

18    "Songbird" means Songbird Acquisitions, LLC.

19    "Stock Purchase Agreement" means Stock Purchase Agreement dated as of July

20    16, 2014, between AerLine and the Estate of Sky King, Inc., a copy of which is attached

21    hereto as **Exhibit "A".**

22

1    "Successful Bidder" means AerSale, Inc., pursuant to the Order entered by this

2    Court on June 16, 2014.

3    "Tax Claims" means a Claim against any of the Debtor that is of a kind specified

4    in Section 507(a)(8) of the Bankruptcy Code.

5    "TOA" means the Trans Ocean Airline, Inc.

6    "Unsecured Claim" means any Claim other than Secured Claims, (up to the

7    Allowed amount subject to recoupment or setoff as provided in section 506(a) of the

8    Bankruptcy Code), Administrative Claims, Priority Claims, and Tax Claims.

9    "U.S. Trustee" means the Office of the United States Trustee, Sacramento,

10    California.

11    **1.2    Interpretation.**

12    Unless otherwise specified, all section, article, and exhibit references in the Plan are to

13    the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived,

14    or modified from time to time.  The headings in the Plan are for convenience of reference only

15    and shall not limit or otherwise affect the provisions of the Plan.  Words denoting the singular

16    number shall include the plural number and vice versa, and words denoting one gender shall

17    include the other gender.  The Disclosure Statement may be referred to for purposes of

18    interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy

19    Court to be ambiguous.

20    **1.3    Application of Definitions and Rules of Construction Contained in the Bankruptcy
        Code.**

21

22    Words and terms defined in section 101 of the Bankruptcy Code shall have the same

23    meaning when used in the Plan, unless a different definition is given in the Plan.  The rules of

1    construction contained in section 102 of the Bankruptcy Code shall apply to the construction of

2    the Plan.

3    **1.4    Other Terms.**

4    　　The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to

5    the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

6    A term used herein that is not defined herein shall have the meaning ascribed to that term, if any,

7    in the Bankruptcy Code.

8    **II.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**

9    **2.1    Claims and Equity Interests Classified.**

10    　　For purposes of organization, distribution, voting and all confirmation matters, except as

11    otherwise provided herein, all Claims (except for Administrative Claims and Tax Claims) and all

12    Equity Interests shall be classified as set forth in this Article of the Plan.

13    **2.2    Claims and Equity Interests.**

14    　　The Plan classifies the Claims against and Equity Interests in the Debtor as follows:

15    　　　　　　(a)    Class 1-A:    Secured Claim of TOA

16    　　　　　　(b)    Class 1-B    Secured Claim of Songbird

17    　　　　　　(c)    Class 1-C    Other Secured Claims

18    　　　　　　(d)    Class 2-A    Post-Trustee Administrative Claims

19    　　　　　　(e)    Class 2-B    Pre-Trustee Administrative Claims

20    　　　　　　(f)    Class 3:    Priority Claims

21    　　　　　　(g)    Class 4:    Unsecured Claims

22    　　　　　　(h)    Class 5:    Insider Claims

23    　　　　　　(i)    Class 6:    Equity Interests

## III.    IDENTIFICATION OF IMPAIRED CLASSES
## OF CLAIMS AND EQUITY INTERESTS

**3.1    Impaired Classes of Claims and Equity Interests.**

All classes are impaired under the Plan.

**3.2    Impairment Controversies.**

If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is impaired under the Plan, the Bankruptcy Court shall determine such controversy.

## IV.    PROVISIONS FOR TREATMENT OF CLAIMS
## AND EQUITY INTERESTS UNDER THE PLAN

**4.1    Treatment of Claims and Equity Interests.**

The classes of Claims against and Equity Interests in the Debtor shall be treated under the Plan as follows:

**Class 1-A Secured Claim of TOA**

Classification.  Class 1-A consists of the Allowed Secured Claim, if any, of TOA arising out of the purported DIP loan.

Treatment.    TOA will receive $195,000 in complete satisfaction of TOA's secured claims and DIP loan, paid to Hefner, Stark & Marois's client trust account. Payment to be made within ten (10) days of entry of the order confirming the Plan, not the Effective Date.  Treatment is conditioned on Bankruptcy Court approval through the confirmed Plan, with TOA's rights to object to confirmation and the Disclosure Statement preserved in the event that acceptable language is not approved by the Bankruptcy Court.   The Trustee agrees to be bound by this treatment regardless of

1    whether there is an Effective Date under the Plan, and in the event that there is no

2    Effective Date under the Plan within forty-five (45) days of entry of the Confirmation

3    Order, agrees to seek approval of this agreement as a stand-alone compromise of

4    controversies.

5            Impairment and voting. Class 1-A is impaired by this Plan.

6    **Class 1-B Secured Claim of Songbird**

7            Classification.  Class 1-B consists of the Allowed Secured Claim, if any, of

8    Songbird arising out of the purported DIP loan.

9            Treatment.  Songbird or the true holders of this claim shall waive any distribution

10    from the Purchase Price and consent to a surcharge of any lien in favor of the Trustee.

11    Any claim will be treated as a general unsecured claim in Class 4.

12            Impairment and voting. Class 1-B is impaired by this Plan.

13    **Class 1-C Other Secured Claims**

14            Classification.  Class 1-C consists of the Allowed Secured Claims, if any, of any

15    other secured claimants.  At the time of the filing of the original Plan, the Trustee was

16    unaware of any other valid secured claims.  In the meantime, two parties asserted other

17    secured claims or trust fund claims.

18    (1) The United States government (other than the IRS) has asserted among other things,

19    post-petition claims for security fees and passenger inspection user fees of approximately

20    $127,402.97 - specifically, the Transportation Security Administration ("TSA") has

21    asserted a claim for security fees in the amount of $73,372.20, the United States

22    Department of Agriculture ("USDA") has asserted a claim for passenger inspection user

1    fees of $17,659.86 and the Customs and Border Protection ("CBP") has also asserted for

2    passenger inspection user fees of $36,370.91.

3        Treatment (US – other than IRS).  Without admission as to any breach of trust

4    fund liability or whether the post-petition security fees and passenger inspection user fees

5    should be considered administrative claims against the estate as opposed to monies held

6    in trust by the Debtor, the TSA, USDA and CBP shall collectively be paid $15,000 and

7    the balance of their claims for security fees and passenger inspection user fees shall be

8    allowed  Class 2-B claims.

9    (2)  The United States government (IRS) has asserted a secured claim in the amount of

10   $660,898 per proof of claim 86-3.

11       Treatment (US – IRS).  The IRS will be paid $225,000 on the Effective Date in

12   full satisfaction of its secured claims in the case.  The remainder of the IRS's claim(s)

13   will be treated as set forth in Class 3 – Priority Claims and Class 4 – Unsecured Claims.

14   The IRS has consented to this treatment.

15       Impairment and voting.  Class 1-C is impaired by this Plan.

16   **Class 2-A Post-Trustee Administrative Claims**

17       Classification.  Class 2-A consists of the pre-confirmation Administrative Claims

18   of the Trustee and his professionals.

19       Treatment.  These claimants will receive a Pro Rata Share of $225,000 from the

20   Purchase Price or other available cash, and will otherwise receive a Pro Rata Share of the

21   proceeds from the liquidation of all of the Post-Confirmation Assets by the Plan

22   Administrator.  The Post-Confirmation Administrative Claims will be paid upon final

23   applications and orders approving the same.  If the Post-Trustee Administrative Claims

total less than $225,000, the balance will be transferred to the Plan Administrator.  The failure of any particular holder of an Administrative Claim in Class 2-A to object to the Plan or file a rejection ballot for the Plan shall constitute agreement by such holder to the treatment of such Administrative Claim as provided herein, which treatment is different from the treatment provided for such Administrative Claim in Section 1129(a)(9)(A) of the Bankruptcy Code.

Impairment and voting.  Class 2-A is impaired by this Plan.

**Class 2-B Pre-Trustee Administrative Claims**

Classification.  Class 2-B consists of the Administrative Claims incurred prior to the appointment of the Trustee.

Treatment.  These claimants will receive a Pro Rata Share of $100,000 from the Purchase Price and otherwise receive a Pro Rata Share of the proceeds from the liquidation of all of the Post-Confirmation Assets by the Plan Administrator after payment of Post-Confirmation Administrative Claims and Post-Trustee Administrative Claims.  The failure of any particular holder of an Administrative Claim in Class 2-B to object to the Plan or file a rejection ballot for the Plan shall constitute agreement by such holder to the treatment of such Administrative Claim as provided herein, which treatment is different from the treatment provided for such Administrative Claim in Section 1129(a)(9)(A) of the Bankruptcy Code.

Impairment and voting.  Class 2-B is impaired by this Plan.

**Class 3 – Priority Claims**

Classification.  Class 3 consists of all Allowed Priority Claims.

1        <u>Treatment.</u>  These claimants will receive a Pro Rata Share of $50,000 from the

2    Purchase Price and otherwise receive a Pro Rata Share of the proceeds from the

3    liquidation of all of the Post-Confirmation Assets by the Plan Administrator after

4    payment of Post-Confirmation Administrative Claims, Post-Trustee Administrative

5    Claims and Pre-Trustee Administrative Claims. The failure of any particular holder of a

6    Priority Claim in Class 3, including without limitation the holder of any Tax Claim, to

7    object to the Plan or file a rejection ballot for the Plan shall constitute agreement by such

8    holder to the treatment of such Priority Claim as provided herein, which treatment is

9    different from the treatment provided for such Priority Claim in Section 1129(a)(9)(B),

10    (C) or (D) of the Bankruptcy Code, as applicable to such Claim.

11        <u>Impairment and voting.</u>  Class 3 is impaired by this Plan.

12    **Class 4 – Unsecured Claims**

13        <u>Classification.</u>  Class 4 consists of all Unsecured Claims, except Insider Claims.

14        <u>Treatment.</u>  Each holder of an Allowed Unsecured Claim in Class 4 shall receive

15    a Pro Rata Share of the proceeds from the liquidation of all of the Post-Confirmation

16    Assets by the Plan Administrator, after payment of Post-Confirmation Administrative

17    Claims and all Allowed Claims in Classes 1-A, 2-A, 2-B and 3.

18        <u>Impairment and voting.</u>  Class 4 is impaired by this Plan and the holders are

19    entitled to vote to accept or reject the Plan.

20    **Class 5 – Insider Claims**

21        <u>Classification.</u> Class 5 consists of any and all Claims held by Insiders.

1    Treatment.  Each holder of an Allowed Insider Claim in Class 5 shall receive a

2    Pro Rata Share of all funds remaining, if any, after the payment in full of Allowed

3    Unsecured Claims in Class 4.

4    Impairment and voting.  Class 5 is impaired by this Plan and the holders are

5    entitled to vote to accept or reject the Plan.

6    **Class 6 – Equity Interests**

7    Classification.  Class 6 consists of all Equity Interests in the Debtor.

8    Treatment.  On the Effective Date, all existing Equity Interests shall be terminated

9    and effectively cancelled and such holder shall receive nothing on account of its Equity

10   Interest.  New Equity Interests in the Reorganized Debtor shall be issued pursuant to the

11   Stock Purchase Agreement.

12   Impairment and voting.  Class 6 is impaired by this Plan and deemed to have

13   rejected the Plan.

14   **V.     PROVISIONS FOR TREATMENT OF
       UNCLASSIFIED CLAIMS UNDER THE PLAN**

15

16   **5.1**   All claims are classified in Article IV above.

17   **VI.    ACCEPTANCE OR REJECTION OF THE PLAN;
       EFFECT OF REJECTION BY ONE OR MORE**

18   **CLASSES OF CLAIMS OR EQUITY INTERESTS**

19   **6.1   Classes Entitled to Vote.**

20   Holders of a Claim in an impaired class are entitled to vote.  Holders of an Equity Interest

21   in Class 6 will receive nothing as a result of their Equity Interest and are therefore deemed to

22   have rejected the Plan.

23

**6.2    Class Acceptance Requirement.**

Only holders of Claims that are of record and as to which an objection is not pending shall be entitled to accept or reject the Plan.  A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.

**VII.    MEANS FOR IMPLEMENTATION OF THE PLAN**

**7.1    Reorganization of the Debtor.**

(a)    Consummation of Transactions

On or prior to the Effective Date, the Trustee and AerLine shall take all actions that are necessary or appropriate to effectuate the reorganization and restructuring of the Debtor as contemplated by the Stock Purchase Agreement and this Plan, including, but not limited to:

1.    The Trustee and AerLine shall consummate the Stock Purchase Agreement, and the Reorganized Debtor shall issue 100% of the New Common Stock for distribution pursuant to the Plan to AerLine in consideration for the payment of the Purchase Price; and

2.    The Trustee shall establish a Post Confirmation Plan Administration for purposes of (i) receiving the Purchase Price and the other Post-Confirmation Assets, (ii) liquidating any non-cash Post-Confirmation Assets and pursuing any Causes of Action, (iii) making distributions in accordance with the Plan, and (iv) reviewing, resolving, compromising, and objecting to Claims to the extent necessary.  See Article IX.

(b)    Offering and Issuance of Securities Pursuant to Section 1145

The offering, issuance, and distribution of the New Common Stock pursuant to the Plan shall be exempt pursuant to section 1145 of the Bankruptcy Code from the registration

1    requirements of section 5 of the Securities Act and from any state or local law requiring

2    registration for offer or sale of a security or registration or licensing of an issuer of a security.

3    (c)    Vesting of Assets in the Reorganized Debtor

4    Except as otherwise provided herein or in the Stock Purchase Agreement, on the

5    Effective Date Assets of the estate of the Debtor (other than the Post-Confirmation Assets) shall

6    vest in the Reorganized Debtor, free and clear of all Liens, Clams, charges, or other

7    encumbrances whatsoever.  On and after the Effective Date, except as otherwise provided in the

8    Plan, the Reorganized Debtor may operate its business and use, acquire, or dispose of property

9    without supervision or approval by the Bankruptcy Court and free of any restrictions of the

10   Bankruptcy Code or the Bankruptcy Rules.

11   (d)    Corporate Action; New Board

12   Each of the matters provided for by the Plan or the Stock Purchase Agreement involving

13   the consummation of the transactions contemplated by the Stock Purchase Agreement and the

14   Plan, the establishment of the capital and corporate structure, amending or modifying the

15   governance documents of the Debtor, or other corporate or related actions to be take by or

16   required of the Debtor, the Trustee, or the Reorganized Debtor, whether taken prior to or as of

17   the Effective Date, shall be authorized without the need for any further corporate action and

18   without any further action by or approval of any shareholders, directors, or managers of the

19   Debtor.    On the Effective Date, AerLine may appoint a new board of directors for the

20   Reorganized Debtor, and on and after the Effective Date the Reorganized Debtor and the officers

21   and members of the board of directors thereof are authorized to and may issue, execute, deliver,

22   file, or record such contracts, securities, instruments, releases, and other agreements and take

23   such other actions as may be necessary or appropriate to effectuate, implement, and further

1  evidence the terms and conditions of the Plan, without the need for any approvals,

2  authorizations, or consents.

3  (e)    Section 1146(a) Exemption

4    Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the

5  Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles

6  or similar tax or governmental assessment.  Upon entry of the Confirmation Order, the

7  appropriate state or local governmental officials or agents shall forgo the collection of any such

8  tax, fee, or governmental assessment and accept for filing and recordation any instruments or

9  other documents evidencing transfers under the Plan without the payment of any such tax, fee, or

10  governmental assessment.

11  (f)    Trade Name and Caption

12    Upon the Effective Date, the Post-Confirmation Plan Administration shall be named Post

13  Confirmation OSK.  The Reorganized Debtor shall be known as "Sky King, Inc." Upon the

14  Effective Date, the caption of this case shall be changed from:

15  **UNITED STATES BANKRUPTCY COURT**<br>**EASTERN DISTRICT OF CALIFORNIA**

16  **SACRAMENTO DIVISION**

17  In re:                                  Case No. 12-35905 – C – 11

18  SKY KING, INC.,                         Chapter 11 Proceeding

19      Debtor.

20  To the following caption:

21

22  **UNITED STATES BANKRUPTCY COURT**<br>**EASTERN DISTRICT OF CALIFORNIA**<br>**SACRAMENTO DIVISION**

23

In re:

1

POST CONFIRMATION OSK

2

3          Debtor.

4

Case No. 12-35905 – C – 11

Chapter 11 Proceeding

5    **7.2    Funding of the Plan**

6          This Plan will be funded through (a) the $500,000 Purchase Price currently held by the

7    Trustee in connection with the Stock Purchase Agreement; (b) the collection of Receivables; and

8    (c) the Litigation Proceeds and (d) proceeds from the liquidation of all of the Post-Confirmation

9    Assets by the Plan Administrator.  All Post-Confirmation Assets shall be transferred to a Post-

10   Confirmation Plan Administration to be administered by the Trustee who will be appointed as

11   Plan Administrator on the Effective Date.

12   **7.3    Causes of Action.**

13          Except as otherwise provided in the Plan, all Causes of Action assertable by or on behalf

14   the Debtor or its creditors, including, but not limited to, Avoidance Actions, shall be irrevocably

15   vested in and exclusively assertable by the Plan Administrator.  The failure to specifically

16   identify any Causes of Action in the Disclosure Statement or otherwise shall not in any way

17   estop the Trustee or Plan Administrator or the Estate from asserting such Causes of Action.  As

18   set forth in Section 7.2 above, all Causes of Action shall be transferred to a Post-Confirmation

19   Plan Administration to be administered by the Plan Administrator.

20   **7.4    Distributions under the Plan.**

21          The Plan Administrator shall make all Distributions required under the Plan.  Whenever

22   any Distribution to be made under this Plan shall be due on a day other than a Business Day,

- 25 -

such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due. For federal income tax purposes, a Distribution will be allocated to the principal amount of a Claim first and then, to the extent the Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

**7.5    Timing of Distributions under the Plan.**

Unless set forth herein otherwise, the Plan Administrator shall distribute all Cash Assets, less a reasonable reserve to be determined by the Plan Administrator, on or about the Effective Date, with subsequent Distribution to be made as additional Cash Assets become available and as agreed by the Trustee.

**7.6    Address for Delivery of Distributions under the Plan.**

Subject to Bankruptcy Rule 9010, any Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth on the Proof of Claim filed by such holder (or at the last known address of such holder if no Proof of Claim is filed or if the Trustee has been notified of a change of address). If any holder's Distribution or payment is returned to the Plan Administrator as undeliverable, no further Distributions or payments to such holder shall be made unless and until the Plan Administrator is notified of such holder's then current address within three (3) months after such Distribution or payment was returned, at which time any missed Distribution or payment shall be made to such holder without interest.

**7.7    Distributions under Fifteen Dollars.**

No Distribution of less than fifteen dollars ($15.00) shall be made by the Plan Administrator to the holder of any Claim unless a request therefor is made in writing to the Plan Administrator. If no request is made as provided in the preceding sentence, all such

Distributions shall revert to the Plan Administrator for distribution to holders of Allowed Claims in accordance with the Plan.

**7.8    Time Bar to Cash Payments.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Plan Administrator by the holder of the Allowed Claim with respect to which such check originally was issued.  Any request in respect of such a voided check shall be made on or before one hundred eighty (180) days from the date of issuance of such check.  If no claim is made as provided in the preceding sentence, all Claims in respect of void checks shall be discharged and forever barred and such unclaimed Distributions or payments shall revert to the Estate for the benefit of holders of Allowed Claims.

**7.9    Manner of Payment under the Plan.**

Unless the Person receiving a Distribution agrees otherwise, any Distribution to be made in Cash under the Plan shall be made, at the election of the Plan Administrator, by check drawn on a domestic bank or by wire transfer from a domestic bank.

**7.10    Expenses Incurred on or after the Confirmation Date and Claims of the Trustee**

Except as otherwise ordered by the Bankruptcy Court or as provided herein, the amount of any reasonable expenses incurred by the Trustee on or after the Confirmation Date (including, but not limited to, taxes) to be paid to or by the Trustee shall be withheld from the amounts to be distributed by the Trustee until such compensation and expenses are satisfied in full. Consequently, amounts actually received by holders of Allowed Claims may be less than the gross distributions provided for under the Plan by the amount of distributions to the Trustee, or its agents, for the payment of reimbursement claims of the Trustee.  Professional fees and

1   expenses incurred by the Trustee from and after the Confirmation Date in connection with the

2   effectuation of the Plan shall be paid in the ordinary course after ten (10) days' notice to the

3   Trustee, and U.S. Trustee.  Formal fee applications shall not be required.  Any dispute regarding

4   compensation or expenses shall be resolved by agreement of the parties (Trustee, and U.S.

5   Trustee) or if the parties are unable to agree, as determined by the Bankruptcy Court.

6   **7.11    Fractional Distributions.**

7       Notwithstanding anything to the contrary contained herein, no cash payments of fractions

8   of cents will be made.  Fractional cents shall be rounded to the nearest whole cent (with any

9   amount of .5 cent or less to be rounded down).

10  **7.12    Effectuating Documents and Further Transactions**.

11      The Trustee and the Plan Administrator shall be authorized to execute, deliver, file, or

12  record such contracts, instruments, releases, indentures, and other agreements or documents and

13  take such actions as may be necessary or appropriate to effectuate and further evidence the terms

14  and conditions of the Plan and any notes or securities issued pursuant to the Plan.

15                          **VIII.   EFFECT OF CONFIRMATION**

16  **8.1    Discharge of the Debtor.**

17      As of the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims

18  and Equity Interests thereunder shall be in exchange for and in complete satisfaction, discharge,

19  and release of all Claims and Equity Interests of any nature whatsoever against the Debtor, the

20  Reorganized Debtor or any of their Assets; (ii) the Plan shall bind all holders of Claims and

21  Equity Interests, notwithstanding whether such holders failed to vote to accept or reject the Plan

22  or voted to reject the Plan; (ii) all Claims and Equity Interests shall be satisfied, discharged, and

23  released in full, and the Debtor's and Reorganized Debtor's liability with respect thereto shall be

1  extinguished completely; and (iv) all Persons shall be precluded from asserting against the

2  Debtor, the Reorganized Debtor, their successors and assigns, and their Assets any Claims or

3  Equity Interests based upon any document, instrument, act or omission, transaction, or other

4  activity of any kind or nature that occurred prior to the Effective Date  Notwithstanding the

5  foregoing, nothing in this Plan or the Confirmation Order shall operate (x) to expand the

6  discharge of the Debtor, the Post-Confirmation Plan Administration, or the Post-Confirmation

7  Assets  beyond the discharge established by the Bankruptcy Code or (y) to limit the discharge of

8  the Reorganized Debtor or the Assets other than the Post-Confirmation Assets in any manner

9  whatsoever.  Nothing in the Plan or the Confirmation Order shall discharge any claims of the

10  United States against the Debtor, the Post-Confirmation Plan Administration or the Post-

11  Confirmation Assets arising on or after the Confirmation Date.   Nothing in the Plan or

12  Confirmation Order shall apply to prevent the United States Internal Revenue Service from

13  asserting responsible person liability under 26 U.S.C. 6672.

14  **8.2    Automatic Stay.**

15  Notwithstanding confirmation of this Plan, the automatic stay shall remain in full force

16  and effect at all times until the closing of this case.

17  **8.3    Exculpation**

18  Effective as of the Effective Date, none of the Debtor, the Trustee, the Successful Bidder,

19  AerLine, or the Reorganized Debtor (each a "Released Party") shall have or incur, and each

20  Released Party is released and exculpated from, any Claim arising out of or related to any act or

21  omission in connection with or relating to (i) the in-court or out-of-court efforts to implement the

22  transactions contemplated by the Stock Purchase Agreement and the Plan; (ii) the formulation,

23  preparation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any

1   contract, instrument, release, or other agreement or document created or entered into in

2   connection therewith, including, but not limited to, the Stock Purchase Agreement, the

3   Disclosure Statement, or the Plan; (iii) the solicitation of acceptances or rejections, and pursuit of

4   confirmation and consummation, of the Plan; (iv) the administration and implementation of the

5   Plan; and (v) the distribution of property under the Plan (each an "Exculpated Claim") or any

6   obligation, cause of action, or liability for any Exculpated Claim; provided, however, that the

7   foregoing shall not exculpate any Person from liability resulting from any act or omission that is

8   determined in a Final Order to have constituted actual fraud, gross negligence, or willful

9   misconduct by such Person.  Each Released Party has, and upon confirmation shall be deemed to

10  have, participated in good faith and in compliance with the applicable provisions of the

11  Bankruptcy Code with regard to solicitation of acceptances or rejections of the Plan and the

12  making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any

13  time for the violation of any applicable law, rule, or regulation governing the solicitation of

14  acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Nothing in

15  the Plan or Confirmation Order shall apply to prevent the United States Internal Revenue Service

16  from asserting responsible person liability under 26 U.S.C. 6672.

17  **8.4**    **Injunction**

18          Except as described in the following sentences, from and after the Effective Date, all

19  Persons are permanently enjoined from taking any action against any Released Party, including,

20  but not limited to, (i) commencing or continuing in any manner any action or other proceeding of

21  any kind on account of or in connection with any Claim or Equity Interest; (ii) enforcing,

22  attaching, collecting, or recovering by any manner or means any judgment, award, decree, or

23  order against a Released Party or its property or assets on account of or in connection with any

Claim or Equity Interest; (iii) creating, perfecting, or enforcing any encumbrance of any kind against a Released Party or its property and assets on account of or in connection with any such Claim or Equity Interest; or (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from a Released Party on account of or in connection with such Claim or Equity Interest. With respect to the Released Parties other than the Reorganized Debtor (such Released Parties other than the Reorganized Debtor, collectively, the "Pre-Confirmation Released Parties"), this provision is limited to acts under Section 8.3 and also excepts: (a) the liability of any Pre-Confirmation Released Party that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan, (b) the liability of any Pre-Confirmation Released Party that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct, and (c) actions taken by Pre-Confirmation Released Parties who are holders of a Claim and are taking actions in pursuit of the allowance or payment of such Claim. Nothing in the Plan or the Confirmation Order shall enjoin, release, impair or otherwise preclude the United States (i) from pursuing any criminal action or any police or regulatory action, including any action under the False Claims Act; (ii) from pursuing any liability to the United States that is not a "claim" within the meaning of 11 U.S.C. § 101(5) of the Bankruptcy Code; (iii) from exercising its rights of recoupment and/or setoff; and (iv) from exercising the Internal Revenue Service's rights to assert responsible person liability under 26 U.S.C. § 6672.

## IX.    THE PLAN ADMINISTRATOR

### 9.1    Powers and Duties.

Pursuant to the terms and provisions of the Plan, the Plan Administrator shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims; (b) make distributions contemplated by the Plan; (c) comply with the Plan and the obligations thereunder; (d) employ, retain, or replace professionals to represent it with respect to his responsibilities; (e) object to Claims as specified in Article XI hereof, and prosecute such objections; (f) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim as provided in Article XI hereof; (g) make annual and other periodic reports regarding the status of Distributions under the Plan to the holders of Allowed Claims that are outstanding against the Debtor at such time, such reports to be made available upon request to the holders of any Contested Claim; and (h) exercise such other powers as may be vested in the Plan Administrator pursuant to any agreement, order of the Bankruptcy Court, or the Plan.

Notwithstanding that the Case is a case under Chapter 11 of the Bankruptcy Code, upon the Confirmation Date, the Plan Administrator shall have all powers granted to a debtor-in-possession, Chapter 7 trustee or Chapter 11 trustee under the Bankruptcy Code, including but not limited to, all powers, rights and privileges under Sections 363, 364, 365, 505, 510, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 723, 1107, 1141, 1142 and 1146 of the Bankruptcy Code. Any and all sales of Assets after the Confirmation Date shall be deemed sales under this Plan and shall be exempt from any stamp tax or documentary tax pursuant to section 1146(a) of the Bankruptcy Code.

**9.2    Distributions.**

Pursuant to the terms and provisions of the Plan, the Plan Administrator shall on the Distribution Date, make the required Distributions specified under the Plan.  To the extent all or a portion of a Contested Claim becomes an Allowed Claim subsequent to the Effective Date, the Trustee shall distribute to the holder of such Contested Claim the applicable interim or initial distributions within thirty (30) days of such Contested Claim becoming an Allowed Claim.

**9.3    Compensation and Expenses Incurred by the Plan Administration**

Upon the Effective Date, the Trustee shall distribute $150,000 plus any balance from the proceeds allocated to Class 2-A Post-Trustee Administrative Claims to the Plan Administrator as a reserve for the expenses and compensation of the Plan Administrator and his professionals. The Plan Administrator and his professionals shall be paid in the ordinary course after ten (10) days notice to the office of the U.S. Trustee.  Formal fee applications shall not be required.  Any dispute regarding the compensation or expenses shall be resolved by agreement or if the parties are unable to agree, as determined by the Bankruptcy Court.

**9.4    Exculpation.**

Except as otherwise provided in this Section, the Plan Administrator, together with his officers, directors, employees, agents, professionals and representatives, are hereby exculpated by all Persons, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action, and other assertions of liability (including breach of fiduciary duty) arising out of the discharge of the powers and duties conferred upon the Plan Administrator by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Plan Administrator's willful misconduct or gross negligence.  No holder of a Claim or an Equity

1  Interest, or representative thereof, shall have or pursue any claim or cause of action (a) against

2  the Plan Administrator or his employees, agents, or representatives for making payments or

3  Distributions in accordance with the Plan, or for liquidating the remaining Estate Assets to make

4  Distributions under the Plan, or (b) against any holder of a Claim for receiving or retaining

5  payments or transfers of assets as provided for by the Plan.  Nothing contained in this Section

6  shall preclude or impair any holder of an Allowed Claim from bringing an action in the

7  Bankruptcy Court against the Plan Administrator to compel the making of Distributions

8  contemplated by the Plan on account of such Claim.

9  **X.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

10  **10.1    Rejection of Executory Contracts and Unexpired Leases.**

11  Any executory contracts or unexpired leases of the Debtor that (a) have not been

12  approved by the Bankruptcy Court prior to the Confirmation Date for assumption and

13  assignment or rejected by the Trustee, and (b) are not the subject of pending motions to assume

14  or reject on the Confirmation Date, shall be deemed to have been rejected by the Trustee.  The

15  Plan shall constitute a motion to reject such executory contracts and unexpired leases, and the

16  Estate shall have no liability thereunder except as is specifically provided in the Plan.  Entry of

17  the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such

18  rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy

19  Court that each such rejected executory contract or unexpired lease is burdensome, and that the

20  rejection thereof is in the best interest of the Debtor, the Estate, and all parties in interest in the

21  Case.

22  The lease by and between Sky King Airlines, Inc., and Webster Business Park, LLC,

23  which is the subject of an action for possession pending in the Miami-Dade County (Case No.

1  14-4630) has been terminated by mutual agreement. For the sake of clarity, this lease is deemed

2  rejected under the Plan.

3  **10.2    Claims Arising from Rejection or Termination.**

4  Claims created by the rejection of executory contracts or unexpired leases or the

5  expiration or termination of any executory contract or unexpired lease prior to the Confirmation

6  Date must be filed with the Bankruptcy Court and served on the Trustee (a) in the case of an

7  executory contract or unexpired lease rejected by the Debtor or Trustee prior to the Confirmation

8  Date, in accordance with the Bar Date Order or the respective Order authorizing such rejection,

9  or (b) in the case of an executory contract or unexpired lease that (i) was terminated or expired

10  by its terms prior to the Confirmation Date, or (ii) is deemed rejected pursuant to Section 10.1 of

11  the Plan, no later than thirty (30) days after the Confirmation Date, or (c) in the case of an

12  executory contract or unexpired lease that is rejected by the Trustee after the Confirmation Date,

13  within thirty (30) days after the entry of an order of the Bankruptcy Court authorizing and

14  approving such rejection.  Any such Claims for which a proof of claim is not filed and served

15  within such time will be forever barred from assertion and shall not be enforceable against the

16  Debtor, the Estate, or any of their Assets, properties, or interests in property.  Unless otherwise

17  ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be

18  treated as Unsecured Claims under the Plan subject to objection by the Trustee.

19  

**XI.    PROCEDURES FOR RESOLVING
AND TREATING CONTESTED CLAIMS**

20

21  **11.1    Objection Deadline.**

22  As soon as practicable, but in no event later than one hundred and twenty (120) days after

23  the Effective Date (subject to being extended by the Bankruptcy Court upon motion of the Plan

1  Administrator without notice or a hearing), objections to Claims shall be filed with the

2  Bankruptcy Court and served upon the holders of each of the Claims to which objections are

3  made.

4  **11.2    Prosecution of Contested Claims.**

5      The Plan Administrator may object to the allowance of Claims filed with the Bankruptcy

6  Court with respect to which liability is disputed in whole or in part.  All objections that are filed

7  and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in

8  accordance with Section 11.3 of the Plan.

9  **11.3    Claims Settlement Guidelines.**

10      Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule

11  9019, from and after the Effective Date, all Claims and all claims that the Plan Administrator has

12  asserted against other parties may be compromised and settled according to the following

13  procedures:

14      Subject to this section and the Court's Order dated June 16, 2014 (Doc. No. 861)

15  on the Chapter 11 Trustee's Motion for Settlement Procedures and for Standing Order

16  Authorizing Compromise, the following settlements or compromises do not require the

17  review or approval of the Bankruptcy Court or any other party in interest:

18      The settlement or compromise of a Claim pursuant to which such Claim is

19  Allowed in an amount of $50,000 or less; and

20      The settlement or compromise of a Claim where the difference between the

21  amount of the Claim listed on the Schedules and the amount of the Claim proposed to be

22  Allowed under the settlement is $50,000 or less; and

The settlement or compromise of a claim in favor of the Plan Administrator where the difference between the Plan Administrator's demand and the amount of the settlement is less than $50,000.

The following settlements or compromises shall be submitted to the Bankruptcy Court for approval:

Any settlement or compromise not described above; and

Any settlement or compromise of a Claim or a claim asserted by the Plan Administrator that involves an "Insider."

**11.4    No Distributions Pending Allowance.**

Notwithstanding any other provision of the Plan, no payment or Distribution shall be made with respect to any Claim to the extent it is a Contested Claim unless and until such Contested Claim becomes an Allowed Claim, subject to the Estate's setoff rights as provided in Section 14.10 of the Plan.

**11.5    Distributions After Allowance.**

Payments and Distributions to each holder of a Contested Claim, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provision of the Plan governing the class of Claims to which the respective holder belongs.

**11.6    Estimation of Claims.**

The Trustee or Plan Administrator may, at any time, request that the Bankruptcy Court estimate any Contested Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Trustee or Plan Administrator has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any

1    Claim, including during the pendency of any appeal relating to any such objection. In the event

2    that the Bankruptcy Court estimates any Contested Claim, that estimated amount will constitute

3    either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined

4    by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such

5    Claim, the Trustee or Plan Administrator may elect to pursue any supplemental proceedings to

6    object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and

7    resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one

8    another.    Claims may be estimated and subsequently compromised, settled, withdrawn or

9    resolved by any mechanism approved by the Bankruptcy Court.

10    ### XII.    CONDITIONS PRECEDENT TO CONFIRMATION OF THE
### PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE

11

12    **12.1    Conditions Precedent to Confirmation.**

13    The Clerk of the Bankruptcy Court shall have entered an order or orders, including the

14    Confirmation Order, authorizing the Trustee to execute, implement, and to take all actions

15    otherwise necessary or appropriate to give effect to, the transactions contemplated by the

16    Confirmation Order.

17    **12.2    Conditions Precedent to the Occurrence of the Effective Date.**

18    The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court,

19    be final, not subject to appeal and in full force and effect and not be subject to any stay or

20    injunction, and the Transaction (as defined in the Stock Purchase Agreement) shall have been

21    closed in accordance with the terms of the Stock Purchase Agreement.

22

23

**12.3    Waiver of Conditions.**

The Trustee may waive any of the conditions set forth in Sections 12.1 or 12.2 of the Plan.

### XIII.    RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and Bankruptcy Rule 9027, the Bankruptcy Court shall retain and shall have the broadest jurisdiction over any and all matters related to this Case or in any way effecting the liquidation, including any issue, matter or proceeding (a) arising under the Bankruptcy Code, (b) arising in or related to the Case or the Plan, (c) relating to property of the Estate, Causes of Action, or Assigned Causes of Action, (d) relating to Insiders, or (e) that relates to or has any effect upon any of the following:

1.    To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article X hereof for the rejection of executory contracts or unexpired leases to which any of the Debtor is a party, or with respect to which the Debtor may be liable, and to hear and determine any and all Claims resulting therefrom or from the expiration or termination of any executory contract or unexpired lease;

2.    To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Trustee after the Effective Date, including, without express or implied limitation, any application to the Bankruptcy Court relating to any proceedings to avoid or recover any preferences, fraudulent transfers, or other voidable transfers, or otherwise to recover assets for the benefit of the creditors;

3.    To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

4.    To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

5.    To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

6.    To hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330 and 331 of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

7.    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan (and all documents, instruments, agreements, schedules, and exhibits thereto) or their interpretation, implementation, enforcement, or consummation;

8.    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

9.    To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by or against the Estate;

10.    To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

11.    To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Trustee, or the Estate may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

12.    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Trustee or any Person;

13.    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action in favor of the Estate (including Avoidance Actions) commenced by the Trustee before, or the Trustee after the Effective Date, including any and all issues relating to insurance coverage or proceeds;

14.    To enter an order or final decree closing the Case;

15.    To determine such other issues or matters and for such other purposes as may be provided in the Confirmation Order;

16.    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order;

17. To hear and determine any disputes as it pertains to the Plan Administration or Plan Administrator and

18    To hear and determine any other issues or matters related hereto and not inconsistent with the Bankruptcy Code.

Confirmation of this Plan shall not be construed so as to narrow or limit the jurisdiction of the Bankruptcy Court in any way.

## XIV.   MISCELLANEOUS PROVISIONS

**14.1    Payment of Statutory Fees**.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, shall be paid by the Trustee on or before the Effective Date.  Any such fees accrued after the Effective Date will be paid in the ordinary course by the Plan Administrator.

**14.2    Dissolution of the Committee.**

The Committee shall be dissolved upon the Confirmation Date.

**14.3    Notices.**

Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

IF TO THE TRUSTEE AND PLAN ADMINISTRATOR:
Gerard A. McHale, Jr., Trustee and Plan Administrator
c/o Angelina Lim, Esq.
Johnson Pope Bokor Ruppel & Burns LLP
403 E. Madison St.
Tampa, FL 33602
Angelinal@jpfirm.com

**14.4   Headings.**

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**14.5   Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Florida, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

**14.6   Notice of Entry of Confirmation Order and Relevant Dates.**

Promptly upon entry of the Confirmation Order, the Trustee shall serve on all known parties in interest and holders of Claims, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan, including, but not limited to, any deadline for filing notice of Post-Trustee Administrative Claims and any deadline for filing rejection damage claims.

**14.7   No Interest or Attorneys' Fees.**

Except as expressly stated in the Plan, or as allowed by the Bankruptcy Court, no interest, penalty or late charge arising after the Petition Date, and no award or reimbursement of attorneys fees or related expenses or disbursements, shall be allowed on, or in connection with, any Claim. Nothing in the Plan or Confirmation Order shall preclude the United States and its agencies from assessing interest with respect to any claims arising after the Petition Date.

1   **14.8   Modification of the Plan.**

2        As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be

3   proposed in writing by the Trustee at any time before confirmation provided that the Plan, as

4   modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the

5   Trustee shall have complied with section 1125 of the Bankruptcy Code. The Trustee may

6   modify the Plan at any time after confirmation and before substantial consummation, provided

7   that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy

8   Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified under

9   section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. A

10   holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or

11   rejected, as the case may be, such Plan as modified, unless, within the time fixed by the

12   Bankruptcy Court, such holder changes its previous acceptance or rejection.

13   **14.9   Revocation of Plan.**

14        The Trustee reserves the right to revoke and withdraw the Plan prior to the occurrence of

15   the Effective Date. If the Trustee revokes or withdraws the Plan or if the Effective Date does not

16   occur, then the Plan and all settlements set forth in the Plan shall be deemed null and void and

17   nothing contained herein shall be deemed to constitute a waiver or release of any Claims against

18   or equity interests in the Debtor or to prejudice in any manner the rights of the Estate or any

19   Person in any other further proceedings involving the Debtor.

20   **14.10   Setoff Rights.**

21        In the event that the Estate has a claim of any nature whatsoever against the holder of a

22   Claim, the Trustee may, but is not required to, setoff against the Claim (and any payments or

23   other Distributions to be made in respect of such Claim hereunder) the Estate's claim against the

1  holder, unless any such Claim is or will be released under the Plan, subject to the provisions of

2  section 553 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of any Claim

3  under the Plan shall constitute a waiver or release of any claims that the Estate may have against

4  the holder of a Claim.

5  **14.11  Compliance with Tax Requirements.**

6      In connection with the Plan, the Plan Administrator shall comply with all withholding

7  and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all

8  Distributions hereunder shall be subject to such withholding and reporting requirements.

9  Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution

10  under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of

11  any tax obligations imposed by any government unit, including income, withholding and other

12  tax obligations, on account of such Distribution. The Plan Administrator has the right, but not

13  the obligation, to not make a Distribution until such holder has made arrangements satisfactory

14  to the Plan Administrator for payment of any such tax obligations. Pursuant to section 1146(c)

15  of the Bankruptcy Code, the issuance, transfer, or exchange of promissory notes, equity

16  securities, or other instruments under the Plan, the creation of any mortgage, deed of trust, or

17  other security interest, the making or assignment of any lease or sublease or the making or

18  delivery of any deed or other instrument of transfer under, in furtherance of, or in connection

19  with the Plan, including, without limitation, any merger agreements or agreements of

20  consolidation, deeds, bills of sale, or assignments executed in connection with any of the

21  transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer,

22  mortgage recording, or other similar tax.

23

**14.12  Recognition of Guaranty Rights.**

The classification and manner of satisfying Claims under the Plan takes into consideration (a) the possible existence of guaranties by the Debtor of obligations of other Persons, and (b) the fact that the Debtor may be a joint obligor with other Persons with respect to an obligation.  All Claims against the Debtor based upon any such guaranties or joint obligations shall be discharged and satisfied in the manner provided in the Plan; provided, that no creditor shall be entitled to receive more than one recovery with respect to any of its Allowed Claims.  Notwithstanding the foregoing, nothing in this Plan or the Confirmation Order shall preclude the United States from pursuing any and all third parties who may be liable on its Claims (for avoidance of doubt, "third parties" shall not include AerSale, Inc., AerLine or the Reorganized Debtor), including the assertion by the United States Internal Revenue Service of any responsible person liability under 26 U.S.C. § 6672.

**14.13  Binding Effect.**

The Plan shall be binding upon and inure to the benefit of the Estate and the Trustee, the Plan Administration and Plan Administrator, the holders of all Claims and Equity Interests, and their respective successors and assigns.  To the extent any provision of the Disclosure Statement may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

**14.14  Severability.**

**SHOULD THE BANKRUPTCY COURT DETERMINE THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE TRUSTEE MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 14.8 OF THE PLAN SO**

THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY CLAIM OR EQUITY INTEREST. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

Dated: August 6, 2014.

Respectfully submitted,

/s/ Michael C. Markham
**Johnson Pope Bokor Ruppel & Burns LLP**
Michael C. Markham
Florida Bar No. 0768560

1890148_3

1  THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY

2  CLAIM   OR   EQUITY   INTEREST.   SUCH   A   DETERMINATION   OF

3  UNENFORCEABILITY   SHALL   NOT   (A)   LIMIT   OR   AFFECT   THE

4  ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF

5  THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR

6  REJECTION OF THE PLAN.

7
   Dated: August 6, 2014.
8
   Respectfully submitted,
9
   /s/ Michael C. Markham
10 **Johnson Pope Bokor Ruppel & Burns LLP**
   Michael C. Markham
11 Florida Bar No. 0768560

12

13

14

15

16

17

18

19

20

21

22

23  1890148_4

**EXECUTION COPY**

# STOCK PURCHASE AGREEMENT[1]

Dated as of July 16, 2014

by and between

AerLine Holdings LLC

and

The Estate of Sky King, Inc.

---

[1] Pursuant to Order Approving AerSale, Inc., as the Successful Bidder submitting the highest and best offer for the Debtor's Business dated June 16, 2014, in case no. 12-35905-C-11, pending in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division.

501343808v12



**Table of Contents**

Page

ARTICLE I DEFINITIONS .................................................................................................... 1

    1.1     Defined Terms ..................................................................................................... 1
    1.2     Other Definitional Provisions ............................................................................. 8

ARTICLE II PURCHASE AND SALE OF SHARES .......................................................... 9

    2.1     Purchase and Sale of the Shares ......................................................................... 9
    2.2     Deposit of Purchase Price ................................................................................... 9
    2.3     Liabilities of Debtor ........................................................................................... 9

ARTICLE III CLOSING AND PURCHASE PRICE ........................................................... 9

    3.1     Closing ................................................................................................................ 9
    3.2     Closing Deliveries............................................................................................. 10

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF TRUSTEE........................... 10

    4.1     Organization and Good Standing; Authority ................................................... 11
    4.2     Title to Shares; Debtor's Assets........................................................................ 11

ARTICLE V [RESERVED] ................................................................................................ 11

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER................................ 11

    6.1     Organization and Good Standing; Authority ................................................... 12
    6.2     No Conflict........................................................................................................ 12
    6.3     Consents and Approvals ................................................................................... 12
    6.4     Brokers.............................................................................................................. 12

ARTICLE VII COVENANTS OF THE PARTIES................................................................ 13

    7.1     Conduct of Business Pending the Closing ....................................................... 13
    7.2     Bankruptcy Matters........................................................................................... 13
    7.3     Access ............................................................................................................... 14
    7.4     Employee Matters ............................................................................................. 14
    7.5     Payment of Transfer Taxes and Tax Filings. ................................................... 15
    7.6     Reasonable Efforts; Notification....................................................................... 15
    7.7     Contracts ........................................................................................................... 16
    7.8     Further Assurances............................................................................................ 16
    7.9     Regulatory Approval......................................................................................... 16
    7.10    Receipt of Mail ................................................................................................. 16
    7.11    Automatic Stay.................................................................................................. 16
    7.12    Notice of Events................................................................................................ 17
    7.13    Capitalization of Reorganized Debtor as of the Effective Date....................... 17

i

7.14     Corporate Name; Cessation of Use of Name ................................................................. 17

ARTICLE VIII CONDITIONS TO OBLIGATIONS OF THE PARTIES ................................. 18

8.1     Conditions Precedent to Obligations of Buyer ................................................ 18
8.2     Conditions Precedent to the Obligations of the Trustee and Debtor ........................... 19

ARTICLE IX TERMINATION......................................................................................... 20

9.1     Termination of Agreement........................................................................... 20
9.2     Consequences of Termination...................................................................... 21

ARTICLE X MISCELLANEOUS ..................................................................................... 21

10.1    Expenses .................................................................................................. 21
10.2    Assignment ............................................................................................... 21
10.3    Parties in Interest...................................................................................... 22
10.4    Notices ..................................................................................................... 22
10.5    Choice of Law............................................................................................ 23
10.6    Entire Agreement; Amendments and Waivers ............................................. 23
10.7    Counterparts ............................................................................................. 23
10.8    Invalidity .................................................................................................. 24
10.9    Headings ................................................................................................... 24
10.10   Exclusive Jurisdiction ................................................................................ 24
10.11   WAIVER OF RIGHT TO TRIAL BY JURY.................................................. 24
10.12   Beneficiaries ............................................................................................. 24
10.13   Counting.................................................................................................... 24
10.14   Preparation of this Agreement .................................................................... 24

501343808v12

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement") is dated as of July 16, 2014 (the "Agreement Date") by and between AerLine Holdings LLC, a Delaware limited liability company ("Buyer"), and the Estate of Sky King, Inc., a California corporation (the "Debtor").

### WITNESSETH:

WHEREAS, the Debtor was engaged in the business of providing general passenger charter flight services through a fleet of Boeing 737 aircraft until January 26, 2014 (the "Business");

WHEREAS, the Debtor has commenced a case (the "Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") on August 31, 2012 by filing a voluntary petition with the United States Bankruptcy Court for the Eastern District of California (the "Bankruptcy Court");

WHEREAS, Gerard A. McHale, Jr. was appointed as Chapter 11 Trustee of the Debtor (the "Trustee") by the Bankruptcy Court on February 18, 2014;

WHEREAS, the Bankruptcy Court has approved AerSale, Inc. ("AerSale"), or its assigns as the successful bidder by order dated June 16, 2014 ("Sale Order");

WHEREAS, pursuant to the Plan (as defined below), all of the outstanding shares of capital stock of Debtor are to be cancelled and, in accordance with and subject to the terms of this Agreement and the Plan, Buyer shall acquire 100% of the newly issued shares (the "Shares") of the New Common Stock (as defined below) of Reorganized Debtor (the "Transaction"); and

WHEREAS, the Trustee, on behalf of the Debtor's estate, and Buyer have determined that it is in their respective best interests to consummate the Transaction and in furtherance thereof, have approved this Agreement and the transactions contemplated hereby.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

### ARTICLE I

### DEFINITIONS

1.1    Defined Terms. As used herein, the terms below shall have the following respective meanings:

"Accounts Receivable" shall mean all accounts receivable of the Debtor and all other rights of Debtor to payment, owed or that may become owed, together with all security or

1

collateral therefor and any interest or unpaid financing charges accrued thereon, to the Debtor with respect to services performed on or prior to the Effective Date.

"Affiliate" shall have the meaning set forth in Section 101 of the Bankruptcy Code.

"Agreement" shall mean this Agreement (together with all schedules and exhibits referenced herein).

"Agreement Date" shall have the meaning ascribed to such term in the preamble.

"Alternative Transaction" shall mean any transaction or transactions pursuant to which the Debtor and/or the Trustee, in one or a series of transactions, sells the Shares or capital stock or equity interests of the Debtor or sells, transfers, leases or otherwise disposes, directly or indirectly, all or significant portion of Debtor's assets, other than the Transaction; provided, however that an Alternative Transaction does not and shall not be deemed to include any transaction with Buyer or any Affiliate of Buyer.

"Ancillary Instruments" means all schedules, exhibits, certificates, agreements, documents or statements delivered pursuant to this Agreement.

"Bankruptcy" shall have the meaning ascribed to such term in the Recitals.

"Bankruptcy Code" shall have the meaning ascribed to such term in the Recitals.

"Bankruptcy Court" shall have the meaning ascribed to such term in the Recitals.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure.

"Books and Records" shall mean all files, documents, instruments, papers, books and records relating to the Business of the Debtor, including without limitation financial statements, Tax Returns and related work papers and letters from accountants, budgets, pricing guidelines, ledgers, journals, deeds, title policies, minute books, stock certificates and books, stock transfer ledgers, Contracts, Licenses, customer lists, computer files and programs, retrieval programs, operating data and plans and environmental studies and plans.

"Business" shall have the meaning ascribed to such term in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in Miami, Florida are authorized or obligated by law or executive order to close.

"Buyer" shall have the meaning ascribed to such term in the preamble.

"Case" shall have the meaning ascribed to each such term in the Recitals.

"Claims" shall mean any rights, demands, claims, actions and causes of action that any Person may have against any third party, including any Governmental Unit.

"Closing" shall have the meaning ascribed to such term in Section 3.1.

2

"Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court pursuant to Section 1128 of the Bankruptcy Code for the purpose of confirming the Plan.

"Confirmation Order" shall mean the Order of the Bankruptcy Court approving this Agreement and the Transaction on a final basis and confirming the Plan pursuant to Section 1129 of Bankruptcy Code, which order (and any exhibits, appendices and related documents) shall be in form and substance acceptable to the Buyer and the Trustee.

"Consent" shall mean any approval, consent, notification, permission, waiver or authorization.

"Contract" shall mean any lease, license, agreement, contract, contract right, purchase order, obligation, trust, instrument and other similar arrangements, whether or not in written form, used or held for use or related to the Business that is binding upon a Person or its property; provided, however, that "Contracts" shall not include any Governmental Authorization.

"Copyrights" shall have the meaning ascribed to it in the definition of the term Intellectual Property.

"Debtor" shall have the meaning ascribed to such term in the Recitals; provided, however, that all references in this Agreement to the term Debtor shall mean the Estate of the Debtor (and not the Reorganized Debtor) immediately after the Effective Date.

"Disclosure Schedule" shall have the meaning ascribed to such term in the opening paragraph of Article IV.

"Deposit" shall have the meaning ascribed to such term in Section 2.2.

"Disclosure Statement" shall mean the Trustee's disclosure statement, including any exhibits, appendices, related documents, ballots and procedures related to the solicitation, in each case, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, in respect of the Plan and that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules and other applicable law, and which shall be in form and substance acceptable to the Trustee and Buyer.

"Disclosure Statement Motion" means the motion or request to be filed or made by the Trustee with the Bankruptcy Court seeking entry of the Disclosure Statement Order, which motion (including any exhibits, appendices or related documents) shall be in form and substance acceptable to the Trustee and Buyer.

"Disclosure Statement Order" means an order of the Bankruptcy Court approving the Disclosure Statement and the solicitation, which order (including any exhibits, appendices or related documents) shall be in form and substance acceptable to the Trustee and Buyer.

"DOT" means the United States Department of Transportation.

"Effective Date" shall mean the date that is one (1) Business Day (or such later Business Day mutually agreed to by the Trustee and Buyer) after all conditions specified in Article VIII have been satisfied or waived.

"Effective Time" shall have the meaning ascribed to such term in Section 3.1.

"Estate of Debtor" shall mean the Debtor (and not the Reorganized Debtor) immediately after the Effective Date.

"Excluded Assets" shall mean (a) all cash, Accounts Receivable and causes of action of the Debtor or the Trustee, and (b) any equity or other interest in any Person, including SGB Miami Charter Services LLC.

"Excluded Liabilities" shall have the meaning ascribed to such term in Section 2.3(b).

"FAA" shall mean the Federal Aviation Administration.

"Final Order" shall mean an Order of the Bankruptcy Court or other court of competent jurisdiction (i) that is not the subject of a pending appeal, petition for certiorari, motion for reconsideration or other proceeding for review, rehearing or reargument, (ii) that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect, and (iii) respecting which the time to appeal, to petition for certiorari, to move for reconsideration or to seek review, rehearing or reargument shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules.

"GAAP" shall mean United States generally accepted accounting principles.

"Governmental Authorization" means any approval, consent, license, permit, Order, waiver, or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Unit or pursuant to any applicable Law, including the lapse of any waiting period thereunder.

"Governmental Unit" shall mean any (i) federal, state, local, municipal, foreign or other government; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court, arbitrator or other tribunal); or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Intellectual Property" shall mean all intellectual property rights owned or licensed by Debtor in connection with the Business and arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon (collectively, "Patents"), (ii) know-how, manufacturing and production processes and techniques, (iii) license rights with respect to Intellectual Property; (iv) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, all applications, registrations and renewals thereof, and material unregistered trademarks

4

(collectively, "Trademarks"), (v) copyrights and registrations and applications therefor, works of authorship, and mask work rights and, material unregistered copyrights, in each case used primarily in connection with the Business, (collectively, "Copyrights"), (vi) all Software and Technology of Debtor used in connection with the Business and (vii) all Websites and all Content contained therein.

"Intellectual Property Licenses" shall mean all licenses or other agreements pursuant to which the Debtor has licensed the right to use any Intellectual Property or pursuant to which it has licensed to another Person the right to use any Intellectual Property owned or licensed by the Debtor.

"Knowledge" with respect to any individual, shall mean the actual knowledge of such individual. The "Knowledge of Debtor" shall mean the knowledge of Gerard A. McHale, Jr. as Chapter 11 Trustee of the Estate of the Debtor, after due inquiry given the state of the Debtor's records.

"Law" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, principle of common law, judgment enacted, promulgated, issued, enforced or entered by any Governmental Unit, or other requirement or rule of law.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, and deed of trust or other encumbrance.

"Material Contracts" shall mean all material Real Property Leases, the Equipment Leases, Intellectual Property Licenses and such other Contracts of the Debtor.

"New Common Stock" shall mean the common equity in Reorganized Debtor to be authorized and issued on the Effective Date pursuant to the Plan, which shall constitute all of the common or other capital stock of Reorganized Debtor.

"Non-Real Property Contract" shall mean any Material Contract other than any Real Property Lease.

"Notices" shall have the meaning ascribed to such term in Section 10.4.

"Operating Certificates" shall mean Debtor's DOT certificate of public convenience and necessity and FAA operating certificate, including Air Carrier Certificate No. KNNA122N.

"Order" shall mean any judgment, order, injunction, writ, ruling, verdict, decree, stipulation or award of any Governmental Unit or private arbitration tribunal.

5

"Patents" shall have the meaning ascribed to it in the definition of the term Intellectual Property.

"Permits" shall mean all licenses, permits, franchises and other authorizations of any Governmental Unit relating to the operation of the Business and all pending applications therefor.

"Permitted Liens" shall mean (i) statutory Liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith; and (ii) zoning, entitlement and other land use and environmental regulations or designations by any Governmental Unit provided that such regulations or designations have not been violated, which in each case do not materially interfere with the operation of the Business.

"Person" shall mean an individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, joint stock company, labor union, estate, Governmental Unit or other entity.

"Petition Date" shall mean August 31, 2012.

"Plan" shall mean the plan of reorganization under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or the terms thereof, as the case may be, and the Plan Supplement, including, without limitation, all exhibits and schedules hereto and thereto, and which shall be consistent in all material respects with this Agreement and otherwise in form and substance acceptable to Buyer.

"Plan Supplement" shall mean the compilation of documents and forms of documents, schedules, and exhibits to be filed on the Plan Supplement Filing Date pursuant to and as contemplated in the Plan, as amended, modified or supplemented from time to time in accordance with the terms hereof an in accordance with the Bankruptcy Code and the Bankruptcy Rules, which shall be in form and substance acceptable to the Buyer.

"Plan Supplement Filing Date" shall mean the date that is ten (10) days prior to the Confirmation Hearing.

"Proceeding" shall mean any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Unit or arbitrator.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.2.

"Real Property Leases" shall mean all of the leases for Leased Real Properties.

"Reorganized Debtor" shall mean the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, employees, agents and representatives (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Shares" shall have the meaning ascribed to such terms in the Recitals.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"Tax" or "Taxes" shall mean any current, deferred, federal, state, county, local, foreign and other taxes, assessments, duties or charges of any kind whatsoever, including, without limitation, income, profits, gains, net worth, sales and use, *ad valorem*, gross receipts, business and occupation, license, minimum, alternative minimum, environmental, estimated, stamp, custom duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employees, income withholding, social security, unemployment or other tax, together with any penalty, addition to tax or interest on the foregoing.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"Trademarks" shall have the meaning ascribed to such term in the definition of Intellectual Property. Without limitation, such "Trademarks" include the designations "Sky King" and all variants thereof and composite marks formed therefrom.

"Transaction" shall have the meaning set forth in the Recitals.

"Transfer Tax" or "Transfer Taxes" shall mean any federal, state, county, local, foreign and other sales, excise, use, transfer, conveyance, documentary transfer, recording or other similar Tax, fee or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect

7

thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"Trustee" shall have the meaning ascribed to such term in the Preamble.

"Website" shall mean (i) all websites owned or controlled by Debtor, and all Content and pages contained within each of those websites, hosted anywhere in the world, and (ii) all website user information and data collected by Debtor, including email addresses and domain names, website logs, clickstream data and cookies, but, in each case, excluding freely available graphic or text content, such as clip art or graphic images licensed from commercial media vendors. For each Website, the Content and pages shall include all computer files and documentation for the current version of the Website and all archived Content and pages in Debtor's possession or control. As used herein, the term "Content" means any literary, audio, video, and other information, including editorial content, data, animation, graphics, photographs and artwork, and combinations of any or all of the foregoing, in any tangible or digital formats.

1.2    Other Definitional Provisions.

(a)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(d)    Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(f)    A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)    All references to "$" and dollars shall be deemed to refer to the currency of the United States of America.

(h)    All references to any financial or accounting terms shall be defined in accordance with GAAP except as otherwise specifically defined herein.

8

## ARTICLE II

## PURCHASE AND SALE OF SHARES

2.1     Purchase and Sale of the Shares.  Upon the terms and subject to the conditions of this Agreement, at the Closing, the Trustee shall cause the Debtor to issue, sell, assign, transfer, convey and deliver the Shares to the Buyer, free and clear of all Liens, and the Buyer shall purchase the Shares from the Trustee by releasing the Deposit in accordance with Section 3.2(b)(i).

2.2     Deposit of Purchase Price.  The consideration for the Shares shall equal Five Hundred Thousand ($500,000.00) dollars (the "Purchase Price").  Prior to the Agreement Date, the Buyer deposited with the attorney for the Trustee the Purchase Price in immediately available funds (the "Deposit").  The Deposit shall be held by the Trustee's attorney and released to the Trustee upon the Closing or disbursed to the Buyer in accordance with Section 9.2.  All accrued interest relating to the Deposit shall be paid to the Buyer at Closing or in accordance with Section 9.2.

2.3     Liabilities of Debtor.

(a)     Notwithstanding anything to the contrary, the Trustee agrees that, neither Buyer, through its purchase of the Shares, nor the Reorganized Debtor shall assume or become liable or responsible for any Liabilities of the Debtor, the Estate of the Debtor or any Affiliate or any Liabilities arising out of or related to the Business, all of which shall remain Liabilities of the Debtor or the Estate of the Debtor, as the case may be (the "Excluded Liabilities").  Without limiting the foregoing, all the Liabilities of Debtor arising on or prior to the Effective Date shall be fully and finally discharged pursuant to Section 1141 of the Bankruptcy Code.

(b)     The Reorganized Debtor shall have no Liabilities on the Effective Date.

## ARTICLE III

## CLOSING AND PURCHASE PRICE

3.1     Closing.  Unless this Agreement shall have been terminated or the transactions herein contemplated shall have been abandoned pursuant to Article IX hereof, the closing of the transactions contemplated herein (the "Closing") shall take place at 10:00 a.m. (eastern daylight time) on the Effective Date, unless another time or date is agreed to in writing by the parties. The Closing shall be held in the manner and at the location mutually agreed to by the parties. The Closing shall be effective as of 12:01 a.m. (eastern daylight time) on the Effective Date (the "Effective Time").

9

3.2    Closing Deliveries.

(a)    At the Closing, the Trustee shall deliver, or shall cause to be delivered, to Buyer the following:

(i)    an executed stock certificate of the Reorganized Debtor with respect to the Shares;

(ii)    a certified copy of the Confirmation Order;

(iii)    a certificate from the Trustee dated as the Effective Date, certifying that the conditions specified in Section 8.1 have been satisfied and fulfilled;

(iv)    all other instruments of conveyance and transfer reasonably requested by Buyer, in form and substance reasonably acceptable to Buyer; and

(v)    such other closing instruments and certificates as may be reasonably requested by Buyer.

(b)    At the Closing, Buyer shall deliver, or shall cause to be delivered, the following:

(i)    instructions to the Trustee to release the Deposit to the Trustee in accordance with the terms of this Agreement;

(ii)    a certificate of Buyer, dated as of the Effective Date, signed by a duly authorized officer of Buyer, certifying that conditions specified in Section 8.2(a) hereof have been fulfilled;

(iii)    a copy of the resolutions adopted by the Board of Directors of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, certified by the Secretary or other authorized Person of the Buyer as of the Effective Date; and

(iv)    such other closing instruments and certificates as may be reasonably requested by the Trustee.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF TRUSTEE

Except as set forth in the Disclosure Schedule delivered to Buyer on the date hereof (the "Disclosure Schedule"), the Trustee hereby represents and warrants to Buyer on the Agreement Date and on the Effective Date as follows (Disclosure Schedule shall be arranged in paragraphs corresponding to the section numbers contained in this Article IV, but, regardless of the existence of cross-references or the lack thereof, the disclosure in any paragraph shall only qualify as disclosure for any other section of this Article IV if such disclosure contains sufficient

information so that it is readily and reasonably determinable and apparent that such disclosure qualifies or otherwise applies to other sections of this Article IV):

4.1    Organization and Good Standing; Authority. Pursuant to the Bankruptcy Code and the requisite orders from the Bankruptcy Court, the Trustee has the requisite power and authority to execute and deliver this Agreement and the Ancillary Instruments to which it is, or at the Closing will be, a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

4.2    Title to Shares; Debtor's Assets.

(a)    Pursuant to the Plan and Confirmation Order, at Closing, (i) the Shares of the Reorganized Debtor issued to the Buyer pursuant to this Agreement and the Plan, will be duly authorized, validly issued, fully paid and nonassessable and free and clear of all Liens and Claims, (ii) there will be no (w) outstanding securities convertible or exchangeable into shares of capital stock or equity interests of Reorganized Debtor or Debtor; (x) options, warrants, calls, subscriptions or other rights, agreements or commitments obligating Reorganized Debtor or Debtor to issue, transfer, repurchase, redeem, acquire or sell any shares of its capital stock or other equity securities; (y) voting trusts or other agreements or understandings to which Debtor or the Reorganized Debtor is a party or by which Debtor or the Reorganized Debtor is bound with respect to the voting, transfer or other disposition of its shares of capital stock or other equity securities; or (z) outstanding or authorized equity appreciation, phantom equity or similar rights with respect to Debtor or the Reorganized Debtor, and (iii) no registration rights will be outstanding with respect to Reorganized Debtor's or Debtor's securities.

(b)    Pursuant to the Plan and the Confirmation Order, the Debtor has good and valid title to all assets and properties of the Debtor useful in or related to the Business (including the Operating Certificates, Intellectual Property and Books and Records), free and clear of all Liens (other than Liens solely affecting the Excluded Assets or Liens that will be released and discharged as of, and that will not be enforceable from and after, the Closing by virtue of the Confirmation Order) and, as of the Effective Date, such assets and properties (other than the Excluded Assets) will vest with the Reorganized Debtor, free and clear of all Liens, Liabilities and Claims.

## ARTICLE V

## [RESERVED]

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Trustee as follows:

11

6.1    Organization and Good Standing; Authority.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation.  Buyer has the requisite limited liability company power and authority to enter into this Agreement and the Ancillary Instruments to which it is, or at the Closing will be, a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  This Agreement and the Ancillary Instruments to which the Buyer is a party have been duly executed and delivered by the Buyer, and (assuming due authorization, execution and delivery by the other parties hereto) will constitute the legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with their respective terms.

6.2    No Conflict.  Except as would not have or be reasonably likely to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Instruments to which it is or at the Closing will be a party, the execution and delivery by Buyer of this Agreement and the Ancillary Instruments to which it is or at the Closing will be a party and the transactions contemplated hereby and thereby by Buyer do not and will not (i) violate, conflict with or result in the breach of any provision of the organizational documents of Buyer, (ii) violate any Law or Order applicable to Buyer, or any of Buyer's assets, properties or businesses, or (iii) result in a breach of, constitute a default (or an event which, with or without the giving of notice or lapse of time or both, would become a default) under, require any consent under, or give to others any right of termination, amendment, acceleration, suspension, revocation or cancellation of, any contract to which Buyer is a party or is bound.

6.3    Consents and Approvals.  The execution and delivery by Buyer of this Agreement and the Ancillary Instruments to which Buyer is, or at the Closing will be, a party do not, and the performance by Buyer of this Agreement and the Ancillary Instruments to which Buyer is, or at the Closing will be, a party and the consummation by Buyer of the transactions contemplated hereby and thereby do not and will not, require any Governmental Authorization or filing with or notification of, any Governmental Unit, except for the filing of the FAA Notice and the DOT Notice, and such other filings as would not be reasonably likely to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Instruments to which Buyer is, or at the Closing will be, a party.

6.4    Brokers.  Neither Buyer nor any of its directors, officers, employees or Affiliates has employed any broker, finder, investment banker or Person fulfilling a similar role or has incurred or will incur any broker's, finder's or other similar fees, commissions or expenses, in each case in connection with the transactions contemplated by this Agreement and the Ancillary Instruments for which the Trustee or Debtor will be liable.

**ARTICLE VII**

**COVENANTS OF THE PARTIES**

7.1    Conduct of Business Pending the Closing

Except as required pursuant to an Order of the Bankruptcy Court, and pursuant to the Support Agreement dated June 11, 2014, by and between the Trustee and AerSale, during the period from the Agreement Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing.

(a)    The Debtor shall use its commercially reasonable efforts to preserve in all material respects the assets of the Debtor over which the Trustee has in his possession and control; and

(b)    without limiting the generality of Section 7.1(a), the Trustee shall not cause the Debtor to:

(i)    sell, lease (as lessor), transfer or otherwise dispose of any assets or permit such assets to become subject to any Lien, other than Liens as a result of regulatory matters arising from events or circumstances occuring on or after the date hereof, Liens arising under any Bankruptcy Court orders relating to the use of cash collateral (as defined in the Bankruptcy Code), Liens that will be discharged and removed and not be enforceable against any asset of the Debtor following the Closing in accordance with the Confirmation Order;

(ii)    solely with respect to any action which could have an adverse effect on Buyer, or its operation, management or ownership of the Business following the Closing, make or rescind any material election relating to Taxes, settle or compromise any material claim, action, suit, litigation, Proceeding, arbitration, investigation, audit or controversy relating to Taxes, or, except as required by applicable Law or GAAP, make any material change to any of its methods of Tax accounting, methods of reporting income or deductions for Tax or Tax accounting practice or policy from those employed in the preparation of its most recent Tax Returns;

(iii)    enter into any Material Contract without the prior written consent of Buyer;

(iv)    file any motion, application or pleading with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is not consistent in any material respect with this Agreement or the Plan; or

(v)    agree or commit to do any of the foregoing.

7.2    Bankruptcy Matters.

(a)    The Debtor shall use commercially reasonable efforts to promptly give notice under the Bankruptcy Code of the request for the relief specified in the Disclosure

13

Statement Motion of the Confirmation Hearing and the Effective Date, and any bar date motions, to all creditors and parties in interest entitled to notice thereof pursuant to the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and orders of the Bankruptcy Court, including all Persons that have asserted Liens in or on the Debtor's assets, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement, the Transaction, the Disclosure Statement Motion and confirmation of the Plan.

(b)     Trustee shall use commercially reasonable efforts to provide draft copies of all documents, motions, orders, procedures, agreements and other papers the Trustee intends to file with the Bankruptcy Court to the Buyer and its counsel no later than three (3) days prior to the date the Debtor intends to file any such document, motion, order, procedure, agreement or other paper, other than the Disclosure Statement, the Plan and the Plan Supplement, which shall be provided within a longer reasonable time, and shall use commercially reasonable efforts to consult in advance in good faith with the Buyer regarding the form and substance of any such proposed filings with the Bankruptcy Court.

(c)     If the Disclosure Statement Order, the Confirmation Order or any other orders of the Bankruptcy Court relating to this Agreement, the Transaction or confirmation of the Plan shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Disclosure Statement Order, the Confirmation Order, or other such order), subject to rights otherwise arising from this Agreement, the Trustee, at its cost and expense, shall use its commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion provided; however, in the event the appeal, petition or motion requires the Trustee to engage FAA, DOT or IRS counsel or experts, then such prosecution obligation shall not apply unless Buyer agrees to pay for the reasonable costs of such FAA, DOT or IRS counsel or experts solely in connection with responding to such appeal, petition or motion.

7.3     Access. From the date hereof until the Closing, Trustee (i) shall give Buyer and its Representatives reasonable access during normal business hours to certain specified office space and to the offices, properties, books and records, officers, employees, accountants, auditors, counsel and other representatives of Debtor, (ii) shall furnish to Buyer and its Representatives all management, financial, sales, inventory and other reports generated or provided to the Trustee, (iii) shall furnish to Buyer and its Representatives such other financial, operating and property related data of the Debtor and the Business and such and other information in the possession of the Trustee as such persons reasonably request and (iv) cooperate reasonably with Buyer in its investigation of the Business.

7.4     Employee Matters.

(a)     Hired Employees. Buyer shall have the right (in its sole and absolute discretion), but not the obligation, to offer employment, on an at will basis, effective on the Effective Date, to any or all current or former employees of Debtor. In no event shall Buyer

14

be obligated to hire or retain any current or former employee of Debtor for any period following the Closing. The employees of Debtor who accept Buyer's offer of employment pursuant hereto and who commence employment with Buyer from and after the Effective Date shall be referred to herein as the "Hired Employees." Under no circumstances shall any individual employed or formerly employed by Debtor become an employee of Buyer unless such individual becomes a Hired Employee.

(b)     Release of Hired Employees. With respect to each Hired Employee, effective as of the Closing, Debtor shall be deemed to have waived and released each such individual from any and all contractual or common law provisions related to the Business that are enforceable by Debtor which restricts the employment activities or other conduct of such individuals related to the Business after their termination of employment with Debtor.

(c)     No Transfer of Employees. Nothing herein shall be construed as transferring to Buyer (i) any Contract with any current or former employee of Debtor or for the employment of any Person or engagement of any independent contractor by Debtor or (ii) any rights or obligations Debtor may owe to or be owed by any current or former employee, officer, consultant, independent contractor or agent of Debtor.

(d)     No Third Party Beneficiaries. Nothing herein, express or implied, shall confer upon any employee or former employee of Debtor any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer, the Trustee and Debtor agree that the provisions contained herein are not intended to be for the benefit of or otherwise enforceable by, any third party, including any employee or former employee of Debtor.

7.5     Payment of Transfer Taxes and Tax Filings.

The Plan and the Confirmation Order shall provide, pursuant to Section 1146(a) of the Bankruptcy Code, that any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate, Transfer Tax, mortgage recording tax, or similar tax or governmental assessment. Upon entry of the Confirmation Order, the appropriate state or local government officials or agents shall forego the collection of any such tax, fee or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without payment of any such tax, recordation fee or governmental assessment.

7.6     Reasonable Efforts; Notification.

(a)     Each of the parties will use reasonable efforts to take, or cause to be taken, all actions and use reasonable efforts to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things which to its Knowledge are necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including: (i) the obtaining of all other necessary actions, non-actions, waivers, and Permits from Governmental Units and the making of all other necessary registrations and filings, (ii) the obtaining of all necessary consents, approvals or waivers from third parties

(which in the case of Buyer shall not require Buyer to assume any Liability or incur any expense), and (iii) the execution and delivery of any additional certificates, agreements, instruments, reports, schedules, statements, consents, documents and information necessary to consummate the transactions contemplated by this Agreement.

(b)    Except as required by Law, each party hereto shall promptly inform the other of any communication from any Governmental Unit regarding any of the transactions contemplated by this Agreement. If any party hereto or Affiliate thereof receives a request for additional information or documentary material from any such Government Unit with respect to the transactions contemplated by this Agreement, then such party will use its reasonable efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other party, an appropriate response in compliance with such request.

7.7    Contracts. Except as otherwise expressly provided in the Plan or as otherwise rejected prior to the date hereof, Trustee shall not assume or reject or permit to be assumed or rejected or deemed rejected any Non-Real Property Contract or Real Property Leases without the prior written consent of Buyer and approval of the Bankruptcy Court.

7.8    Further Assurances. Subject to the terms and conditions herein provided, following the Closing, Trustee shall execute and deliver to Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, as shall be reasonably necessary to vest in Buyer all of Debtor's right, title and interest in and to the Shares or to otherwise carry out and give effect to the Transaction. Trustee shall promptly provide copies or otherwise make available to Buyer and Buyer's Representatives, all information and records (financial and otherwise) relating to, or otherwise used or useful in the Business, including digital and manual copies of all FAA manuals and related documentation in Trustee's possession or control.

7.9    Regulatory Approval. Each of Trustee and Buyer will use commercially reasonable efforts to obtain all authorizations, consents, orders and approvals of all federal, state and foreign regulatory bodies and officials that may be or become necessary for the performance of its obligations pursuant to this Agreement and will cooperate fully with the other party in promptly seeking to obtain and maintain all such authorizations, consents, orders and approvals.

7.10    Receipt of Mail. As of the Effective Date, Trustee hereby authorizes Buyer to open any and all mail addressed to the Reorganized Debtor relating to the Business or the assets of the Reorganized Debtor and delivered to the Buyer if received on or after the Effective Date. After the Effective Date, Buyer will use commercially reasonable efforts to forward to Trustee any mail related to the Excluded Assets or not related to the Reorganized Debtor.

7.11    Automatic Stay. The Trustee acknowledges and agrees and shall not dispute that the giving of notice of termination by any party pursuant to this Agreement shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code (and the Trustee hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

501343808v12

7.12    Notice of Events.  During the period from the date of this Agreement until the Effective Date or the earlier termination of this Agreement, each party hereto shall promptly notify the other party hereto in writing as soon as such party becomes aware of the occurrence, or non-occurrence, of any event, condition or circumstance occurring at any time (whether before or after the date of this Agreement) which is material to the Debtor, the Business, the Operating Certificates or the Transaction or which would reasonably be expected to delay or otherwise materially affect the consummation of the Transaction.

7.13    Capitalization of Reorganized Debtor as of the Effective Date.  As of the Effective Date (a) the authorized capital stock of Reorganized Debtor will be as set forth in the certificate of incorporation of Reorganized Debtor, as amended to reflect the terms set forth on the applicable exhibit to the Plan, (b) the only shares of capital stock of the Reorganized Debtor that shall be issued and outstanding shall be the Shares, which shall have been issued in accordance with this Agreement and the Plan and all of which will be duly authorized, validly issued, fully paid and nonassessable, (c) the Shares will be offered, issued, sold and delivered to Buyer, free and clear of all Liens and Claims, and in compliance with all applicable Laws governing the issuance of securities, (d) there will be no (i) outstanding securities convertible or exchangeable into shares of capital stock or equity interests of Reorganized Debtor or Debtor; (ii) options, warrants, calls, subscriptions or other rights, agreements or commitments obligating Reorganized Debtor or Debtor to issue, transfer, repurchase, redeem, acquire or sell any shares of its capital stock or other equity securities; (iii) voting trusts or other agreements or understandings to which Debtor or the Reorganized Debtor is a party or by which Debtor or the Reorganized Debtor is bound with respect to the voting, transfer or other disposition of its shares of capital stock or other equity securities; or (iv) outstanding or authorized equity appreciation, phantom equity or similar rights with respect to Debtor or the Reorganized Debtor, and (e) no registration rights will be outstanding with respect to Reorganized Debtor's or Debtor's securities.

7.14    Corporate Name; Cessation of Use of Name.

(a)    Trustee acknowledges and agrees that as of the Effective Date, as between the Trustee and the Estate of the Debtor, on the one hand, and the Reorganized Debtor, on the other, the Reorganized Debtor shall have the sole, absolute and proprietary right to all names, marks, trade names, trademarks, service names and service marks (the "Names") incorporating "Sky King" and any derivative thereof and to all corporate symbols or logs incorporating "Sky King" and any derivative thereof.

(b)    Following the Effective Date (a) neither the Estate of the Debtor nor the Trustee shall use the name "Sky King" or any derivative thereof or any logos incorporating such name, and all such Names, shall be solely owned by, and vested with, Reorganized Debtor, free and clear of all Liens and Claims.

501343808v12

**ARTICLE VIII**

**CONDITIONS TO OBLIGATIONS OF THE PARTIES**

8.1     Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Effective Time of each of the following conditions:

(a)     Title to Shares.  Pursuant to the Plan and Confirmation Order, at Closing, (i) the Shares of the Reorganized Debtor issued to the Buyer pursuant to this Agreement and the Plan, will be duly authorized, validly issued, fully paid and nonassessable and free and clear of all Liens and Claims, (ii) there will be no (w) outstanding securities convertible or exchangeable into shares of capital stock or equity interests of Reorganized Debtor or Debtor; (x) options, warrants, calls, subscriptions or other rights, agreements or commitments obligating Reorganized Debtor or Debtor to issue, transfer, repurchase, redeem, acquire or sell any shares of its capital stock or other equity securities; (y) voting trusts or other agreements or understandings to which Debtor or the Reorganized Debtor is a party or by which Debtor or the Reorganized Debtor is bound with respect to the voting, transfer or other disposition of its shares of capital stock or other equity securities; or (z) outstanding or authorized equity appreciation, phantom equity or similar rights with respect to Debtor or the Reorganized Debtor, and (iii) no registration rights will be outstanding with respect to Reorganized Debtor's or Debtor's securities.

(b)     Title to Assets.  Pursuant to the Plan and the Confirmation Order, the Debtor shall have good and valid title to all assets and properties of the Debtor useful in or related to the Business (including the Operating Certificates, Intellectual Property and Books and Records), free and clear of all Liens (other than Liens solely affecting the Excluded Assets) and, as of the Effective Date, all of such assets and properties (other than the Excluded Assets) will vest with the Reorganized Debtor, free and clear of all Liens, Liabilities and Claims.

(c)     Performance of Obligations.  Trustee shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Effective Date.

(d)     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Confirmation Order, which shall become a Final Order, and which, among other things, on a final basis (i) confirms the Plan pursuant to Section 1129 of the Bankruptcy Code, (ii) approves and directs, as applicable: (A) the sale of the Shares to Buyer and vests the Reorganized Debtor with all assets and properties of the Debtor (other than the Excluded Assets) on the terms set forth herein, and (B) the performance by the Trustee and Debtor of their obligations under this Agreement; (iii) finds that (A) as of the Effective Date, the Transaction effects a legal, valid, enforceable and effective sale and transfer of the Shares and shall vest Buyer with title to such Shares and vests the Reorganized Debtor with all assets and properties of the Debtor (other than the Excluded Assets), in each case free and clear of all Liens pursuant to the Plan, (B) the consideration provided to the Trustee

18

501343808v12

constitutes reasonably equivalent value and fair consideration for the Shares, and (C) the Debtor gave due and proper notice of this Agreement, the Transaction, the Disclosure Statement, the Plan and the Confirmation Hearing and the Plan to each party entitled thereto, and (iv) contains such other customary terms and provisions as are required by the Buyer. The Confirmation Order shall be a Final Order.

(e)     No Violation of Law or Orders. No provisions of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Unit shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Shares or any of the other transactions contemplated by this Agreement.

(f)     No Prior Sale. The Trustee shall not have entered into or agreed to enter into any transaction or transactions pursuant to which the Trustee, in one or a series of transactions, sells the Shares or capital stock or equity interests of the Debtor or sells, transfers, leases or otherwise disposes, directly or indirectly, of all or significant portion of Debtor's assets (other than in the ordinary course of business), other than the Transaction.

(g)     Termination of All Liabilities. All Liabilities of Debtor arising on or prior to the Effective Date shall be fully and finally discharged pursuant to Section 1141 of the Bankruptcy Code and as of the Effective Date the Reorganized Debtor shall have no Liabilities.

(h)     No Termination of Operating Certificates. The Operating Certificates shall not have been cancelled, revoked or terminated and none of the Debtor, Trustee or Buyer shall have received from the FAA, the DOT or any other Governmental Unit any notice of cancellation, revocation or termination with respect to any of the Operating Certificates, and to the Knowledge of the Debtor and Trustee, except as set forth in Schedule 8.1(h) attached hereto, none of the FAA, the DOT or any other Governmental Unit shall have threatened any such revocation, cancellation, or termination.

8.2     Conditions Precedent to the Obligations of the Trustee and Debtor. The obligation of each of the Trustee and Debtor to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by the Trustee or Debtor, as applicable) at or prior to the Effective Time of each of the following conditions:

(a)     Performance of Obligations. Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or on the Effective Time.

(b)     Confirmation Order. The Confirmation Order shall be in full force and effect, and shall have become a final order, and as of the Effective Date shall not be stayed, enjoined or modified.

(c)     No Violation of Law or Orders. No provisions of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Unit shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Shares or any of the other transactions contemplated by this Agreement.

## ARTICLE IX

## TERMINATION

9.1    Termination of Agreement.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    By written agreement of Debtor, the Trustee and Buyer;

(b)    By Buyer:

(i)    at any time after November 4, 2014, if the Closing shall not have occurred; provided, however, that the failure to Close is not solely due to Buyer's material breach of any of its representations and warranties contained in this Agreement or failure to perform any of its obligations hereunder in any material respect;

(ii)    if any Order restraining, prohibiting or enjoining Buyer or Trustee from consummating the transactions contemplated hereby or any of the other transactions contemplated by the Plan is entered and such Order shall have become a Final Order;

(iii)    if there shall have been a material breach by the Trustee of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within fifteen (15) days after written Notice thereof shall have been received by the Trustee;

(iv)    if the Trustee enters into an agreement to consummate an Alternative Transaction;

(v)    if the Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code;

(vi)    if the Confirmation Order is not a Final Order within ninety (90) days following the date hereof or if at any time after the date hereof the Buyer becomes aware of such facts or circumstances that would cause or would reasonably be expected to cause the Plan to fail to obtain the requisite votes for confirmation; or

(vii)    if all of the conditions set forth in Article VIII have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and the Trustee fails to consummate the transactions contemplated hereby at the Closing.

(c)    By the Trustee:

(i)    if any Order restraining, prohibiting or enjoining Buyer from consummating the transactions contemplated hereby is entered and such Order shall have become a Final Order;

20

(ii) if there shall have been a material breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.2, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within fifteen (15) days after written Notice thereof shall have been received by Buyer; or

(iii) upon consummation of an Alternative Transaction.

9.2 Consequences of Termination. If this Agreement is terminated under and in accordance with Section 9.1, written notice thereof will forthwith be given to the other party and this Agreement will thereafter become void and have no further force and effect and all further obligations of the Estate of Debtor and Buyer to each other under this Agreement will terminate without further obligation or liability of the Estate of Debtor or Buyer to the other, except that:

(a) each party will return or destroy all documents, workpapers and other material of any other party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution of this Agreement, to the party furnishing the same;

(b) if this Agreement is terminated by Buyer pursuant to and in accordance with Section 9.1(b), the Trustee shall promptly pay to Buyer the Purchase Price deposited with the Trustee;

(c) Notwithstanding the foregoing, this Section 9.2, Section 10.1 (Expenses), Section 10.4 (Notices), Section 10.5 (Choice of Law), Section 10.10 (Exclusive Jurisdiction), Section 10.11 (Waiver of Right to Trial by Jury), Section 10.12 (Beneficiaries) and Section 10.14 (Preparation of this Agreement) shall survive any such termination of this Agreement.

## ARTICLE X

## MISCELLANEOUS

10.1 Expenses. Except as otherwise expressly set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the transactions contemplated hereby. As between Buyer, on the one hand, and the Trustee and Debtor, on the other hand, the Trustee and Debtor shall bear all costs of any Persons (other than Buyer, its agents or Affiliates) entitled to reimbursement by the Bankruptcy Court. For avoidance of doubt, the Reorganized Debtor shall not bear or be responsible for any costs and expenses incurred by the Debtor, the Trustee or the Estate of the Debtor.

10.2 Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by the Trustee or Debtor without the prior written consent of Buyer, or by Buyer without the prior written consent of the Trustee and Debtor; provided, that Buyer

21

may assign its rights and liabilities hereunder to one or more Subsidiaries and/or Affiliates of the Buyer, which assignment shall not relieve Buyer of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

10.3    Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of Debtor and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein. Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of either Debtor or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of either Debtor or Buyer, nor any Representative, or controlling Person of each of the parties hereto and their respective Affiliates, shall have any liability or obligation arising under this Agreement or the transactions contemplated hereby.

10.4    Notices. All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, electronic mail, or facsimile, addressed as set forth below, or to such other address as such party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served, transmitted by electronic mail or transmitted by facsimile with confirmation of receipt; provided, that if delivered or transmitted on a day other than a Business Day or after normal business hours, notice shall be deemed given on the next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

      If to the Debtor    Gerard A. McHale, Jr., as the Chapter 11 Trustee
      or the Trustee::    Gerard A. McHale, Jr, P.A.
                           1601 Jackson Street, Suite 200
                           Fort Myers, FL 33901
                           fax (239) 337-1178 and
                           E-mail – jerrym@thereceiver.net

      With a copy to:    Angelina Lim, Esq.
                           403 E. Madison St.
                           Tampa, FL 33602
                           Fax (813) 223-7118
                           E-mail – angelinal@jpfirm.com

| If to Buyer: | AerLine Holdings LLC |
|---|---|
| | 121 Alhambra Plaza, Suite 1700 |
| | Coral Gables, FL 331334 |
| | Attention: Mr. Nicolas Finazzo |
| | Fax: (305) 529-6686 |
| | Email: afinazzo@aersale.com |
| | |
| With a copy to: | AerSale, Inc. |
| | 121 Alhambra Plaza, Suite 1700 |
| | Coral Gables, FL 331334 |
| | Attention: Chief Legal Officer |
| | Fax: (305) 529-6686 |
| | Email: legal@aersale.com |
| | |
| With a copy to: | Pillsbury Winthrop Shaw Pittman LLP |
| | 1540 Broadway |
| | New York, NY 10036-4039 |
| | Attention: Jonathan Russo |
| | Fax: (212) 858-1500 |
| | Email: jonathan.russo@pillsburylaw.com |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

10.5    Choice of Law.  This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the substantive laws of the State of Florida, without giving effect to any provision thereof that would require the application of the substantive laws of any other jurisdiction, except to the extent that such laws are superseded by the Bankruptcy Code.

10.6    Entire Agreement; Amendments and Waivers.  This Agreement and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersede all other prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and the Debtor, or in the case of a waiver, by the party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

10.7    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the

same instrument. Counterparts to this Agreement may be delivered via facsimile. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

     10.8   Invalidity. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the parties shall use their reasonable efforts, including the amendment of this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the parties hereto on the date hereof.

     10.9   Headings. The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

     10.10  Exclusive Jurisdiction. Without limiting any party's right to appeal any order of the Bankruptcy Court, during the Case: (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide (insofar as they relate to Debtor) any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 10.4.

     10.11  WAIVER OF RIGHT TO TRIAL BY JURY. TRUSTEE AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

     10.12  Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement, except as expressly provided herein.

     10.13  Counting. If the due date for any action to be taken under this Agreement (including the delivery of Notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

     10.14  Preparation of this Agreement. Buyer and the Trustee hereby acknowledge that (i) Buyer and the Trustee jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (ii) Buyer and the Trustee have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, this Stock Purchase Agreement has been duly executed and delivered by a duly authorized officer of the Buyer and the Trustee of the Debtor as of the date first above written.

**BUYER:**

AERLINE HOLDINGS LLC

By: _____
Name: Nicolas Finazzo
Title:   Chief Executive Officer

**DEBTOR:**

THE ESTATE OF SKY KING, INC.

By: _____
Name: Gerard A. McHale, Jr.
Title:   Chapter 11 Trustee

[Signature Page Stock Purchase Agreement]

501343808v12

IN WITNESS WHEREOF, this Stock Purchase Agreement has been duly executed and delivered by a duly authorized officer of the Buyer and the Trustee of the Debtor as of the date first above written.

**BUYER:**

AERLINE HOLDINGS LLC

By:_____
    Name: Nicolas Finazzo
    Title:   Chief Executive Officer

**DEBTOR:**

THE ESTATE OF SKY KING, INC.

By:_____
    Name: Gerard A. McHale, Jr.
    Title:   Chapter 11 Trustee

**Schedule 8.1(b)**

Letter to Sky King Inc. from the U.S. Department of Transportation dated June 12, 2014 regarding Notice of Proposed Certificate Action